SMITH *v.* WESTERN WAYNE COUNTY
CONSERVATION ASSOCIATION.

STANBURY *v.* SAME.

1. Nuisance—Noise.

   Noise, to be a nuisance, must be of such a character as to be
   of actual physical discomfort to persons of ordinary sensi-
   bilities.

2. Same—Noise.

   Consideration should be given to such factors as the character
   of the industry complained of, the character, volume, time,
   and duration of the noise, and all the facts and circumstances
   of the case, in determining whether a noise is a nuisance.

3. Same—Noise—Residential Area.

   A controlling principle in determining whether noise constitutes
   a nuisance is that the more residential the area, the less noise
   is tolerable.

---

REFERENCES FOR POINTS IN HEADNOTES

[1–3, 5, 11] 39 Am Jur, Nuisances § 47.
[4] 39 Am Jur, Nuisances § 51.
[6–8] 4 Am Jur 2d, Amusements and Exhibitions § 39.
   Liability for injury by firearms at rifle range, shooting gallery,
   military exercise, etc.; use of firearms in such cases as a nuisance.
   140 ALR 415.
[9] 39 Am Jur, Nuisances § 28.
[10] 39 Am Jur, Nuisances § 151.
[12] 27 Am Jur 2d, Equity §§ 15, 102.
[13, 14] 4 Am Jur 2d, Appeal and Error § 407 *et seq.*

4. SAME—NOISE—TIME OF DAY—INJUNCTION.

Unreasonable noise may be enjoined whenever it occurs, and there is no reason for claiming that one may be as noisy as one pleases as long as the noise stops before bedtime.

5. SAME—NOISE—STANDARD OF REASONABLENESS.

Sufficiency of noise to constitute a nuisance depends upon the effect of the noise upon the ordinary reasonable man, that is, a normal person of ordinary habits and sensibilities, and relief cannot be granted solely upon the subjective likes and dislikes of a particular plaintiff.

6. SAME—NOISE—SHOOTING RANGE.

Finding of trial judge that noise of a shooting range, complained of as a nuisance, was not such as would shock a person of ordinary sensibilities or cause actual physical discomfort *held*, supported by evidence in the record, where trial judge before such finding visited the shooting range and attended an experiment by a sound engineer simulating the actual use of the range for shooting competition and where judge heard testimony of some witnesses that the noise disturbed them and of others that the noise was not unreasonable.

7. SAME—SHOOTING RANGE—DANGER.

Finding of trial court that no real or actual danger to plaintiffs, who were neighbors of a shooting range, existed from stray bullets fired on the range, based on the construction and location of the range, the character of the area, the type of membership of organizations using the range, and the fact that no accidents occurred at a former site used by defendants for a shooting range *held*, supported by evidence in the record in action to abate a nuisance.

8. SAME—DANGER—FEAR.

Relief cannot be granted for nuisance merely on the claim that there exists a fear in the minds of plaintiffs, when there is no actual danger to them.

9. SAME—PROPERTY VALUES.

Decrease in value of property surrounding a shooting range, if it did result from the use of the range, would not in itself constitute a nuisance.

10. SAME—EQUITY—INJUNCTION.

Evidence that a proposed use of real property may constitute a possible nuisance does not entitle plaintiffs to an injunction,

since equity will not interfere in advance of creation of a nuisance, where the injury is doubtful or contingent.

11. SAME—CLUBHOUSE—WEDDING PARTIES—FOOD AND BEVERAGES.

Finding of trial court that use of a clubhouse at a shooting range for wedding parties and the sale of food and alcoholic beverages was not shown to be an unreasonable use of defendant shooting range owner's property so as to constitute a nuisance, *held,* supported by evidence in the record.

12. SAME—JUDGMENT—CONTINUING SUPERVISION.

Judgment of trial court in action by neighboring property owners against owners of a shooting range for a nuisance, which denied the relief prayed for by plaintiffs and permitted defendants to use their ranges and property in any normal manner subject to certain restrictions and ordered that jurisdiction of the causes should be retained for the purposes of superintending control *held,* to be in accord with the usual procedure in such actions, assuring plaintiffs ready and speedy relief should an actionable nuisance develop because of excessive noise, threatened danger to the plaintiffs' safety, or some other reason.

13. APPEAL AND ERROR—STATEMENT OF FACT—COURT RULES.

Statement of facts 66 pages in length, which sets forth in narrative form the testimony of the various witnesses one by one, is not a proper statement of facts and is a violation of the court rule calling for a clear and concise chronological statement in brief narrative form of the facts of the case (GCR 1963, 813.2, 854).

14. SAME—APPENDIX—PORTION OF TESTIMONY.

Appellants' appendix containing 317 pages of testimony and proceedings before trial judge in nuisance action, which required printing by appellees of an appendix of 322 additional pages of testimony and proceedings in order to present a fair display, is a flagrant violation of the court rule requiring that where a portion of the testimony is included in the appendix, there must also be included all other testimony relating to the same subject matter and to its credibility (GCR 1963, 855[3]).

Appeal from Court of Appeals; Lesinski, C. J., and J. H. Gillis and Quinn, JJ., affirming Wayne, Montante (James), J. Submitted March 5, 1968.

(Calendar No. 20, Docket Nos. 51,482, 51,483.)
Decided May 6, 1968.

3 Mich App 83, affirmed.

Complaint by Oak Haven Trailer Court, Inc.,
Clyde E. Smith, Gerald L. Simmons and others, and
complaint by Clarence B. Stanbury and others,
against Western Wayne County Conservation Asso-
ciation and Wayne Conservation Land Company,
Michigan corporations, to enjoin a nuisance. Cases
heard together. Judgment for defendants. Af-
firmed by Court of Appeals. Plaintiffs appeal. On
stipulation and order Oak Haven Trailer Court,
Inc., dropped as party plaintiff and title of action
amended. Affirmed.

*Dale D. Libby,* for plaintiffs.

*Alfred L. Meredith* (*Roland L. Olzark,* of counsel),
for defendants.

*John L. Crandell* (*Dunbar Davis,* of counsel),
for defendant Wayne Conservation Land Company.

PER CURIAM. We adopt the following from the
excellent opinion of the trial judge:*

"Plaintiffs' bill of complaint seeks injunctive
relief. The main question presented for determina-
tion is whether the use of the rifle and pistol ranges
(hereinafter referred to as 'range') constructed on
defendants' property and located in section 19 of
the northwest Plymouth township is a nuisance in
fact and should be enjoined.

"Collateral to the questions of noise and safety
of the range is the question of the use of defend-

---

* For a review of this case *sub nom. Oak Haven Trailer Court,
Inc.,* v. *Western Wayne County Conservation Association,* and *Stan-
bury* v. *Same,* by the Court of Appeals, see 3 Mich App 83.

ants' clubhouse for weddings, parties, et cetera, involving the sale and consumption of food and alcoholic beverages therein, and whether the totality of defendants' operations aforesaid should be declared a nuisance because of increased traffic and alleged depreciation of property values in the surrounding area.

"The range is located in an area which is undeveloped, open agricultural country. A precise and authoritative description of the character of the area is found in *Smith* v. *Plymouth Township Building Inspector,* 346 Mich 57, 60, 61. Plaintiff Smith in that case and plaintiff Smith in the present case are one and the same person. In the cited case, Smith sought a permit to establish a trailer-coach park on his 25-acre tract of land fronting on Ridge road, which was denied to him by the township building inspector, by reason of a township zoning ordinance prohibiting trailer-coach parks in the area. The ordinance was declared unconstitutional in the lower court, and the Supreme Court affirmed, holding that such parks are not, as a matter of law, nuisances *per se* nor detrimental to public health, safety, morals or general welfare.

"*Smith* v. *Plymouth Township Building Inspector* (1956), 346 Mich 57, pp 60, 61:

" 'Plymouth township has experienced the smallest population gain in recent years of all townships in the metropolitan Detroit area, and the only existing construction in western Plymouth township consists of farms, barns, and garage houses, and a small number of custom-built country homes. Zoning district 19, in which petitioners' land is located, is situated in the northwest corner of Plymouth township and is an area approximately 2 miles wide and slightly more than 2 miles long, and contains no existing construction. The proposed trailer camp site is on the westerly side of Ridge road, an unpaved way, and is approximately a half mile south of the Chesapeake & Ohio railroad track. The testimony establishes that in district 30, a district

only slightly smaller and immediately to the south of district 19, there is only 1 house. In district 29, a slightly smaller district to the southeast, there is a small subdivision approximately 2 miles southeast from the proposed site. There is no showing that district 20 is of a substantially different character. The Detroit House of Correction is immediately to the north of the property project site. Aerial photographs taken of the proposed site November 30, 1954, which are exhibits in the case, reveal open, undeveloped land, with only scattered farm buildings, except for the Detroit House of Correction, as far as the horizon.

" 'The evidence establishes conclusively that the area of the proposed site is largely agricultural and open country, and that there is no residential or industrial development in the district itself and surrounding districts.'

"Thereafter, a trailer court was built, consisting of 109 trailer sites. It is owned by Oak Haven Trailer Court, Inc., a plaintiff herein, Smith being one of the owners. There has been no further development in the area since such installation.

"In December, 1961, defendants acquired a 62-acre tract of land, of which 40 acres are in northwest Plymouth township and 22 acres in adjoining Salem township [Washtenaw county], in section 24. The land was purchased with proceeds of funds received by defendants from the Wayne county road commission as the result of eminent domain proceedings, whereby said commission had acquired (for park purposes) defendants' so-called Joy site, located in Nankin township, on which defendants had a clubhouse and gun range. It is not disputed that defendants purchased the property in reliance on their right to use it for the purposes intended, inasmuch as the property was zoned agricultural, permitted gun clubs, and hunting in season had been allowed in the area for many years.[1]

---

"1 Initially, defendants contemplated locating their operations aforesaid in Salem township and had procured a building permit from

"In order to understand more clearly the location of defendants' gun range, it is noted that section 19 is bounded on the north by Phoenix (Five Mile) road, on the east by Ridge road, on the south (roughly) by North Territorial road, and on the west by Napier road. Napier road is the Wayne-Washtenaw county line and the dividing line of sections 19 and 24. Because of swampy and marshy soil, Napier road jogs to the west to higher and firmer ground about one-quarter mile from defendants' tract of land, which fronts on Napier road. Defendants' range is located on the north side of their property, adjoining part of the south line of the property of the Detroit House of Correction. The range consists of three individual ranges, from north to south, described as a 200-, 100-, and 50-yard range. Firing positions are located on the Wayne-Washtenaw county line, about one-quarter mile east of Napier road. Down-range is eastward, where targets are placed immediately in front of an earthen mound, or backstop, having a height of 35 feet, a base of 182 feet, a top level of 132 feet, and a slope of 60 degrees. In addition, each range has earthen side walls, 8 to 10 feet high. There are a number of firing positions, which vary for each range. The 100-yard range is under roof shelter, which has no side walls, having benches or tables for the convenience of the shooters. The 200-yard range was constructed with provisions for a 300-yard-range accommodation at a future date, by increasing the size of the backstop and doing certain grading.

"The range was constructed in accordance with plans and specifications exceeding the requirements of the National Rifle Association. It is used by members and guests of the defendant association, as well as for competitive meets. The association

the planning board. However, when the legal authority of the board was challenged in Washtenaw circuit court, defendants, in order to avoid further delays and difficulties, shifted their operations to Plymouth township."

has about 750 members, including doctors, lawyers, engineers, policemen, et cetera, membership being limited to persons over 18 years of age of good character.

"The principal purposes of the association, as testified by its officers, are: to promote and further the conservation of wild life, game, and natural resources of this State; to improve the relationships between farmer, owner, and hunter, particularly in the western part of Wayne county; and to establish and improve social relationships between its members. To further its aims, the association became affiliated with the Michigan United Conservation Clubs (MUCC), the director of civilian defense, the National Rifle Association, the Michigan Archers Association, and National Wild Life.

"Defendant Wayne Conservation Land Company is merely the land-holding company for the association.

"The incident which ultimately led to the filing of plaintiffs' bill of complaint herein was the occurrence of what has been described in the testimony as a 'big-bore' meet, held on defendants' 200-yard rifle range on May 19-20, 1962, involving some 40 to 50 participants.[2]

---

"2 A 'big-bore' meet consists of teams of 8 shooters, who perform in the following manner:

(1) Shooters fire 8 rounds each in slow fire for 10 minutes, offhand.

(2) They then walk to and examine their targets.

(3) Shooters fire 8 rounds each in slow fire for 10 minutes, while kneeling or sitting.

(4) Targets are examined.

(5) Shooters fire 9 rounds each in rapid fire for 1 minute, while kneeling or sitting.

(6) Targets are examined.

(7) Shooters fire 8 rounds each in slow fire for 10 minutes, while in prone position.

(8) Targets are examined.

(9) Shooters fire 9 rounds each in rapid fire for 1 minute, while in prone position.

(10) Targets are examined for final recovery, which takes about 10 minutes.

The shooters (8) fire 336 rounds over a period of approximately one hour."

"On May 21, 1962, a request was made upon defendants to reverse the range so that the shooting would not be in the general direction of the trailer court. The request was denied, because of defendants' investment in the already constructed range. Thereupon, on June 1, 1962, plaintiffs Smith and Oak Haven Trailer Court, Inc., joined with other property owners living on Ridge, North Territorial, Gottschalk and Napier roads in filing a bill of complaint, seeking to enjoin defendants' use of the range and praying for other relief hereinbefore noted.

"On the filing of the bill, plaintiffs obtained an order directing defendants to show cause why a temporary injunction should not issue, containing a restraining order enjoining defendants from using their lands, 'or any part thereof, for the service of food and beverages to themselves or others, or for the discharge of firearms, either individually or in rifle meets, or in similar contests.' On the hearing thereof, with the consent of the motion judge and approval of the executive judge of this circuit, the parties transformed the hearing to a trial on the merits.

"The trial involved 27 days of actual trial, extending over the period from June 25 to December 7, 1962, covering about 2,000 pages of transcript, wherein 60 witnesses testified and 47 exhibits were received in evidence. In addition, with the parties' consent and their furnishing ground and air transportation, the court personally inspected and viewed defendants' present and former (Joy, Nankin township) sites, including the entire surrounding areas. Then, on August 5, 1962, the court attended a meet staged to simulate the meet held on May 19–20. At that time, through prearranged signals, sound measurements were taken and tape recordings made by a qualified sound engineer at the homes of certain designated plaintiffs, including the closest and farthest from the range, the results of which were

subsequently made a part of the testimonial record herein.

"During the trial, the original restraining order was first modified to permit defendants to serve food and beverages, and then modified to permit use of the range for practice, but not for meets similar to the one held May 19–20.

"While the trial was in progress, cause #626–552 was filed on September 11, 1962. On October 9, 1962, it was consolidated with the trial in progress, by consent of all interested parties.[3] * * *

"Subsequent to the filing of defendants' proposed findings of fact and law on August 26, 1963, and after review of the testimonial record in these causes, the court invited the attorneys herein to a conference to discuss the staging of another meet or demonstration, the purpose thereof being to supplement the testimonial record by sound measurements and recordings from the homes of plaintiffs in cause #626–552 closest to and farthest from the rifle range.

"Thereafter, on October 11, 1963, an order was entered re-opening proofs, based on the written stipulation of the attorneys for all the parties. Pursuant thereto, a rifle-shooting demonstration of *eleven* riflemen (only 8 at a regular meet), using similar rifles and ammunition as used in the demonstration of August 5, 1962, was conducted on October 13, 1963, between 12 noon and 2 p.m., in the presence of the court, attorneys, some plaintiffs, and interested spectators. Sound measurements of rapid fire were made at the homes of plaintiffs Rockwood and Evans, and the results thereof were

---

"[3] Several of plaintiffs' witnesses in cause #622–930 joined with others in filing cause #626–552 against defendants herein, seeking the same relief on substantially the same pleadings. They were represented by an attorney who had testified for plaintiffs in cause #622–930. On filing the bill, the attorney secured an *ex parte* restraining order, signed by another judge of this circuit, who later revoked the same on discovering the fact that trial was in progress in cause #622–930. Thereafter, on stipulation, the causes were consolidated."

filed in the consolidated causes. With this, the proofs were concluded.  *  *  *

"In brief, it is the claim of plaintiffs that the noise from the use of defendants' range is so deafening that it impairs their rights 'to the peace, rest and comfort of their homes'; and that unless such use is abated, it will soon drive them out of their homes and result in irreparable damage to the owners of the trailer court, who will lose their tenants and be prevented from obtaining new tenants.

"It is recognized in Michigan, as well as in other jurisdictions, that under certain circumstances noise may constitute a nuisance and may be enjoined. In *Borsvold* v. *United Dairies,* 347 Mich 672, 681 (82 ALR2d 406), the Court gave the test for a nuisance: 'To render noise a nuisance, it must be of such a character as to be of actual physical discomfort to persons of ordinary sensibilities.' In applying this standard, the court states that consideration should be given to such additional factors as the character of the industry complained of, the character, volume, time and duration of the noise, and 'all the facts and circumstances of the case.' See, also, for the same general standard, *Kobielski* v. *Belle Isle East Side Creamery Co.,* 222 Mich 656 (31 ALR 183), and *Waier* v. *Peerless Oil Co.,* 265 Mich 398.

"The time and locality factors have been given the greatest consideration by the court. Thus, in *Borsvold* and *Waier, supra,* the Court stressed the fact that the noise was depriving plaintiffs of their sleep, both in finding a nuisance and in limiting the scope of injunctive relief to such time.

"In *Rockenbach* v. *Apostle,* 330 Mich 338, the Court made the finding that the nuisance took place in a 'residential district' (p 342). Other cases emphasizing the residential character of the neighborhood to which defendant brought his nuisance include: *De Longpre* v. *Carroll,* 331 Mich 474; *McMorran* v. *Cleveland-Cliffs Iron Co.,* 253 Mich 65; *Obrecht* v. *National Gypsum Co.,* 361 Mich 399,

417; and *Robinson* v. *Baugh,* 31 Mich 290. In *Falkner* v. *Brookfield,* 368 Mich 17, the Supreme Court reversed the trial court, which had dismissed plaintiffs' bill to enjoin an automobile wrecking and junking business, and remanded the case, stating that the issue whether this was a residential neighborhood should have been determined. The controlling principle expressed in these cases is: the more residential the area, the less noise is tolerable. The land development in the instant case does not at all approach that involved in *Rockenbach, supra,* where the city blocks, with 12 lots on each side, were included.

"Plaintiffs herein put a great deal of weight on *Township of West Bloomfield* v. *Chapman,* 351 Mich 606, in comparing the nature of the noise. However, that case went off on a different theory— namely, whether the industrial use of property was in violation of the local zoning ordinance. The zoning ordinance was found to be valid; thus, the improper use of the property was prohibited. Defendants here are not violating a zoning ordinance. They acquired the property for the express purpose of using it in accordance with the permissive features of the ordinance of Plymouth township. This does not mean, of course, that their use of such property is immune from being found a nuisance (*Rockenbach, supra,* p 344). * * *

"Though most of the Michigan cases wherein injunctions have been given have concerned noise which deprived people of sleep, there is no reason for claiming that one may be as noisy as one pleases as long as the noise stops before bedtime. The following cases suggest that unreasonable noise may be enjoined whenever it occurs: *Warren Township School District* v. *City of Detroit,* 308 Mich 460 (1 Av 1162), and *McMorran* v. *Cleveland-Cliffs Iron Co., supra.*

"The noise of the May 19–20 meet has been described by plaintiffs' witnesses as follows: 'Like the army had let loose over there'; 'There was a

terrific uproar of guns, almost continuously, from daylight to dark'; 'It was like the Fourth of July'; 'It sounded like a regular army got up there, opening, loading and firing'; 'It sounded like an army'; 'It could be compared to the backfiring of 20 or 30 nearby automobiles'; 'It sounded like summer maneuvers at Camp Grayling'; 'It reverberated back from the woods across the street'; 'Well, you should have been at my house and heard the racket'; 'It was a powerful noise'; 'It was very noisy and very irritating'; 'You have to leave home to get a rest from it'; 'I never heard such noise like that on a farm'; 'I would never get accustomed to it'; 'It was very excessive, very noisy, and it annoyed me very much'; 'Well, it is loud enough that when you are sitting inside with your doors and windows shut you can still hear them'; 'When you are outside, you can hardly carry on a conversation'; 'Well, you would be sitting there, reading, and all of a sudden you would hear these loud blasts, and it would be maybe 6 or 8 right continuous, and then there would be a little lull, and another would continue, very disturbing, very upsetting. You just can't seem to concentrate, because you are always looking for another loud burst to come along'; 'The noise is so loud during rifle practice that when I was vacuuming in my living room I could still hear it'; 'The noise or rifle practice is very nerve-wracking and aggravating'; 'It is still prevalent in the house, even with the television going'; 'When I am driving my tractor and mowing the lawn and the blades are turning, I can still hear the gun-shots'; 'It is very annoying and it is nerve-wracking'; 'There is no letup over there, and I don't think it is right that we have to suffer for it. These people can go over to the gun club and make the noise that they want to and go back home to their peace. We can't. We have to live with it.'

"On the other hand, testimony of other witnesses, including a number of disinterested witnesses, is to the effect that the noise was not such as would

disturb a normal, reasonable person. Thus, witness Nikkel, who was across the street from the trailer park, said he heard the shooting and that it was not shocking or disturbing. Witness Nulty, who lives on Napier, about one-half mile from the range, testified that he heard some shooting but was not disturbed by it. Witness Schlacht, a tenant of the trailer court, heard the shooting, but the noise was not so shocking nor loud enough to disturb him. There being a sharp dispute as to the effect, intensity, loudness and continuity of the noise produced by the firing, at the court's suggestion, a simulated meet was held on August 5, 1962, as aforesaid, attended by the court, attorneys, litigants, and an expert sound engineer. A maximum of 83 decibels[†] (with 8 shooters) was recorded at plaintiff Rowland's home, about one-half mile away. Other maximum readings were Webb, 52; trailer court, 63; and McClelland, 66–1/2. No sound of firing could be recorded at some of the locations, because of background noises—*i.e.*, birds, cars going by, et cetera. Thereafter, sound recordings were made in open court, with everyone quiet, and a reading of 48 decibels was obtained. Exhibit 37, 'Handbook of Measurements,' shows that normal conversation at three feet is 63 decibels and that 88 decibels is equivalent to the noise inside a sedan in city traffic. At the October 1963 simulated meet (with 11 riflemen), a maximum of 88–1/4 decibels was recorded at plaintiff Evans' home, about one-quarter mile away, on Napier road.

"Plaintiffs contend, however, that the noise made in the August 1962 demonstration was considerably less than that made in the meet of May 19–20, which resulted in the filing of the bill.

"Plaintiff Smith testified:

" '*Q*. How did the noise that you heard from the simulated meet of August 5 compare with the actual meet of May 19 and 20?

---

† Measured on a General Radio Corporation sound level meter and impact analyzer; reference level 0.0002 microbars.—REPORTER,

"'*A.* Well, that is pretty hard to describe. I would say that there was no comparison.

"'*Q.* What do you mean by "no comparison"?

"'*A.* I would say that the shooting on the 19 and 20 of May was 5, 6 times as great as any time we had that simulated match.'

"Plaintiff Alice Stanbury testified that the noise was greater in volume in the May 19–20 meet than in the simulated meet of August 5; Plaintiff Georgia Rowland testified it was much louder May 19–20.

"Defendants, on the other hand, say the simulated meet was identical in all respects to the meet of May 19 and 20.

"Another reference of comparison with the May 19–20 noise level was the sound of firing October 13–14, 1962, at a time when members of the association were 'zeroing in' weapons for hunting season. Plaintiff Trombley testified:

"'*Q.* Compare, if you will, the sound of the firing on May 19 with the sound of the firing on Saturday and Sunday, October 13 and 14.

"'*A.* In comparison, the first one you spoke of, Your Honor, and last Saturday and Sunday, that would be a Sunday School picnic. The intensity, I would say, would be—not measuring it or anything else—I would say, offhand, it was 80% louder.

"'*Q.* This last Sunday?

"'*A.* No, sir; the first day, the May 19.'

"The noise of the shooting at the range bears some relation to the types of weapons used, the number of shooters firing at approximately the same time, and the fact that the shooters are engaged in practice or are participating in a championship meet, calling for slow and rapid firing. Whether the noise is sufficient to constitute a nuisance depends upon its effect upon an ordinary reasonable man, that is, a normal person of ordinary habits and sensibilities. Relief cannot be based solely upon the subjective likes and dislikes of a particular plaintiff. To be workable, relief must be based upon an objective standard of reasonableness.

"It is urged by plaintiffs that the effect of noise upon human beings can not be measured in decibels and that the court must not ignore 'phons' and 'sones,' which involve frequencies and subjective reactions on a measurable basis and psychological functions in relation to certain noises. Plaintiffs thus contend that 'it is not the decibel rating of the noise that is involved; it is how the noise affects the people in the neighborhood.'

"The court having personally attended the demonstrations and having listened to the noise resulting from the use of defendants' range from the homes of various plaintiffs, the closest of which was about a quarter mile away and the farthest being about three-quarters of a mile away, the court does not find the noise to be such as would shock a person of ordinary sensibilities or cause actual physical discomfort. The court finds that the noise is not of such character as to render it a nuisance, considering that the use of the range is consistent with the character of the area, considering the location of plaintiffs' homes, and especially considering the very limited use of the range during the year for competitive meets. The big-bore meet, which produces the highest decibel reading, is held only 4 or 5 times a year; the D.C.M. meet, a one-day affair, twice a year; sportsman rifle, twice a year; and pistol or small-arm meets on very infrequent occasions.

"It is the further claim of the plaintiffs that the range is unsafe; that its use endangers the lives and property of persons living in the area; and that even if found safe, the fears in the minds of the residents resulting from its operation and use render it a nuisance. In support of this claim, the following witnesses were offered:

"Beverly Everson, plaintiff Smith's daughter, a resident in the trailer court, testified that on May 19 she was on her front lawn when she heard a noise over her head which she assumed was a bullet. Harold Gothard, another resident in the court, tes-

tified he heard a noise which to him was a bullet—
*viz.:*

" '*Q.* What did it sound like to you?

" '*A.* I know what it sounds like, and there was a hit and a ricochet—peeng!—like that. That to me was a bullet.'

"There has been no testimony of similar incidents, either during the meet or since then, although the range has been in continuous operation since the restraining order was modified, except for the holding of competitive meets, such as the big-bore and the like.

"Defendants contend, and have offered substantial, credible and worthy proof, that the use and operation of the range is safe. It was constructed according to plans and specifications of the National Rifle Association, incorporating every possible safety feature—for example the U-bar on the 200-yard range. Those using the range are competent and responsible people. The 200-yard range is closed throughout the week, except for week-ends, when its use is supervised by a competent range officer. The chance of an accident happening is very remote. In all the years of defendants' operation of the Nankin township gun range, there never was an accident, although the property was located in a much more populated area, as is the pistol range in Rouge Park of the Detroit police, which is surrounded by a densely populated area. Moreover, according to national statistics, there have been no accidents from the use of gun ranges throughout the country, except for a boy accidentally killed in a target pit through his own carelessness.

"The court is utterly convinced that no real or actual danger exists from the use of defendants' range. It is a reasonable supposition that in the proper use of the range bullets could not pass over the crest of the backstop. As noted, this is not a strictly residential area; it is, rather, undeveloped, open agricultural country, expressly zoned agricultural and expressly permitting its use for gun clubs.

Moreover, hunting in season is allowed and has been allowed for many years in the area. The construction and location of the range, the character of the area, the type of membership, the fact that no accidents occurred at defendants' former site in all the years it was in operation—all indicate that the chances of an accidental shooting are remote, largely speculative and conjectural, and completely insufficient to establish a nuisance in fact.

"Plaintiffs urge, however, that if a gun is raised 3-1/2 degrees from level, a bullet will clear the backstop and could kill someone upon its descent; further, that a gun can accidentally be discharged over the side walls. These things conceivably could happen. The fact that baseballs may be hit out of parks, that golfers may hook or slice out of bounds, that motorists may collide with pedestrians or other motorists (an automobile is considered 'a dangerous instrumentality') does not render such uses nuisances, subject to being enjoined. Nor do we discount the testimony of plaintiffs' 2 witnesses that they heard something 'which sounded like a bullet.' Nonetheless, there is no testimony that the noise they heard actually was created by a bullet passing overhead.

"Nor can relief be granted to plaintiffs merely on the claim that there 'exists' a fear in their minds, even though there is no actual danger. Mere apprehension is insufficient to grant injunctive relief against a claimed nuisance.   *   *   *

"Whether the presence of the range affects the market value of surrounding properties is disputed between the parties. Plaintiffs say it will depreciate their properties; defendants say the value will be increased, as this is low land, unsuitable for development, and serving as a buffer between the property of the Detroit House of Correction and other properties. Assuming, however, that some decrease in value would result, this is not in itself sufficient to constitute a nuisance. *Warren Township School District* v. *City of Detroit, supra.*

"Further, the court finds no merit in plaintiffs' claim that the use of defendants' property for a gun range will increase traffic. There undoubtedly will be some increase in traffic, just as, it is suspected, the operation of the trailer court added to the traffic in that area. At any rate, this is not grounds for injunctive relief. * * *

"Finally, plaintiffs claim that the use of the clubhouse for wedding parties and the sale of food and alcoholic beverages constitute a nuisance. Based on the testimonial record, this court cannot conclude that this will result in any unreasonable use of defendants' property. Moreover, evidence that the proposed use may constitute a possible threatened nuisance does not entitle plaintiffs to an injunction, since equity will not interfere in advance of creation of nuisance, where injury is doubtful or contingent, mere apprehension alone being insufficient."

The trial judge, having carefully considered each of plaintiffs' claims, concluded, as do we, that none could be sustained on the basis of the proofs as to existing conditions or proposed future use of defendants' property. In denying relief to plaintiffs, his judgment carefully safeguarded their rights by imposing certain restrictions upon defendants' activities and providing for continued supervision by the court. The pertinent portion of the judgment reads as follows:

"It is further ordered and adjudged that the relief prayed for by plaintiffs in the complaints filed in the above entitled causes are hereby denied, and

"It is further ordered and adjudged that the defendants are free to use the ranges and property in any normal manner subject to the following:

"a. The defendants shall install and maintain a 40-foot back stop with respect to its 200-yard range.

"b. That the noise level of shooting shall not exceed 88-1/4 decibels at one-quarter mile distance.

"c. That the shooting hours shall be limited on week days between the hours of 9 a.m. and 6 p.m. and on Sundays between the hours of 10 a.m. and one hour after sunset.

"It is further ordered and adjudged that no 300-yard range, whether proposed, or in existence, shall be used without the prior approval of this court after adversary proceedings.

"It is further ordered and adjudged that jurisdiction of said causes shall be retained for the purposes of superintending control of question raised herein."

Such disposition of this case accords with the procedure followed in *Certain-Teed Products Corporation* v. *Paris Township* (1958), 351 Mich 434; and *Certain-Teed Products Corporation* v. *Paris Township* (1959), 355 Mich 302. See, also, *Kenny* v. *Village of Novi* (1962), 367 Mich 75, 77; and *Taylor* v. *Township of Dearborn* (1963), 370 Mich 47, 58, 59. The chancellor's continuing supervision of this matter assures plaintiffs ready and speedy relief should an actionable nuisance develop because of excessive noise, threatened danger to the plaintiffs' safety, or some other reason.

Appellants' so-called statement of facts is 66 pages in length. It sets forth in narrative form the testimony of the various witnesses, witness by witness. This is not a proper statement of facts. The rule calls for "a clear and concise chronological statement in brief narrative form of the facts of the case." (GCR 1963, 813.2, made applicable to appeals to this Court by GCR 1963, 854.)

Appellants' appendix contains 317 pages of testimony and proceedings before the trial judge. GCR 1963, 855(3), requires:

"Where only a portion of the testimony or exhibits is included in the appendix, there must also

be included therein all other testimony and exhibits relating to the same subject matter and to the credibility thereof."

Appellees found it necessary to print in their appendix 322 additional pages of testimony and proceedings before the trial judge in order to present to this Court what appellees considered to be a fair display of the same. Such display, in our opinion, was necessary.

Appellants' violation of the court rules is so flagrant this Court feels called to make this comment thereon and to express its strong disapproval of such practice.

The judgment of the Court of Appeals is affirmed. Costs to appellees.

DETHMERS, C. J., and KELLY, BLACK, T. M. KAVANAGH, SOURIS, O'HARA, ADAMS, and BRENNAN, JJ., concurred.