# STATE OF MICHIGAN

# COURT OF APPEALS

SAVOY ENERGY LP,

            Plaintiff/Counter-Defendant-
            Appellant,

v

LEON BEASINGER, DIANE BRUSCA,
VINCENZO BRUSCA, CHARLES L.
CHEWNING, JANET DANE, LELAND DANE,
EDWARD GERRICK, MARY GERRICK,
STANLEY H. LAMBERT, PAUL LUOTONEN,
MANDON LAKE COMMUNITY CHURCH,
JULIE MURPHY, PERRY MURPHY, JUDITH
SIMMS, LLOYD SIMMS, CATHY SMITH, KIM
A. SMITH, GARY VERMETTE, and NANCY
VERMETTE,

            Defendants/Counter-
            Plaintiffs/Third-Party Plaintiffs-
            Appellees,

and

LESTER J. HOWARD, MABLE I. HOWARD,
JEFFREY D. HOWARD, and BAUMANN
RESOURCES INC.,

            Third-Party Defendants-Appellants.

UNPUBLISHED
May 10, 2018

No. 336392
Otsego Circuit Court
LC No. 14-015609-CH

Before: STEPHENS, P.J., and SHAPIRO and RONAYNE KRAUSE, JJ.

PER CURIAM.

      Plaintiff Savoy Energy LP appeals by right the trial court's order, following a bench trial, that defined restrictions upon Savoy's use of an express easement, known as Birch Valley Trail, that burdens property owned by defendants. Savoy leases property owned by the Howards that is landlocked other than through the easement, and most of defendants' properties are also landlocked other than through the easement Savoy also appeals the trial court's prior partial

-1-

denial of a motion for summary disposition. Generally, Savoy contends that the easement permits essentially unrestricted use of the easement, whereas defendants contend that Savoy's use of the easement with heavy industrial equipment in the pursuit of opening an oil well overburdened their servient estates. We find the trial court's resolution of this matter proper in spirit but excessive in implementation; we therefore affirm in part, vacate in part, and remand for further proceedings.

At one time, Henry Axford, Jr., and his wife owned most of Section 35 of Corwith Township and, to the immediate south, all of Section 2 of Dover Township, both in Otsego County. Axford never lived on Section 35, but used it as a cattle pasture, cut some timber, did some hunting, and eventually began subdividing it and selling off parcels. Axford created Birch Valley Trail by cutting some trees and running a road grader over it. It runs from Old Vanderbilt Road at the north, to the southern half of Section 35 at the south, which is presently owned by the Howards and leased by Savoy. The road remained an unpaved dirt two-track, perhaps twelve to sixteen feet wide, for almost all of its history. However, the easement, which Axford included with all of the parcels he sold in Section 35, was 66 feet wide. Axford included "oil and gas interests" in some of the deeds, although he indicated that there were no oil or gas wells in Section 35 at the time.

In 1988, Axford sold the southern half of Section 35 to Lester and Jeffrey Howard. Relevant to this appeal, the property description in the land contract was:

> The South ½ of Section 35, Town 32 North, Range 2 West, Otsego County, Michigan; together with an easement for purposes of ingress, egress, and public utilities over and across a strip of land described as lying 33 feet either side of a line [metes and bounds details omitted].

At the end of the land contract, in a section labelled "Additional Clauses," it stated, *inter alia*, "Sale includes all oil, gas & mineral rights owned by Sellers." Axford further testified that he had not really been sure what mineral rights he even owned on his property, but when he sold the southern half of Section 35 to the Howards, his intention was that the Howards would use the easement to explore the property for oil and gas. Lester Howard testified that he "hadn't thought about" developing any oil or gas or mineral extraction at the time, but he acquired the rights to do so because "it was just available, and so [he] grabbed it." Jeffrey Dean Howard testified that he believed that the oil, gas, and mineral rights were also important because they greatly enhanced the value of the property.

A considerable amount of testimony was presented from other property owners with little overall narrative. However, there was uniform agreement that Birch Valley Trail was, until Savoy began installing an oil well in 2014, a narrow dirt road that mostly was not even graveled, traffic was extremely minimal, and the appeal of the area had been its quiet and isolated nature. Some parties noted that there were a scattered assortment of gas wells ("Antrim" wells) on some parcels, but that the installation thereof had been brief and their operation was unobtrusive or even completely unnoticeable. It was also readily apparent that much of the displeasure held by the property owners stemmed from the noise of Savoy's oil well in operation, which, we note, has nothing to do with the easement and thus is outside the scope of this matter. Savoy's construction of the oil well, they agreed, radically altered the character of the area with noise and

vibration and odors, severely damaged the road, and caused a great deal of inconvenience for owners attempting to access their own property even aside from the assaultive nuisance. However, they also generally agreed that other than several months of uninterrupted heavy industrial traffic, Savoy appeared to have done nothing objectionable on the easement after construction had ceased.

Other testimony from various oil well experts explained that construction of an oil well was by its very nature a "24/7 operation" that simply could not be interrupted until complete. Representatives from Savoy explained that due to their awareness that the property owners were unhappy, Savoy acquired an easement across other property and constructed a pipeline, so that the raw pumpage from the oil well could be pumped to a processing station offsite rather than hauled away in trucks. Consequently, although Savoy required 24-hour access to the well in the event of an emergency, and the well would need to be checked on, it would be uncommon for anyone to need to be on-site "unless there was something going on." Representatives stated that it was possible that another oil well could be constructed on the Howard property, but that it was highly unlikely to be profitable and thus highly unlikely to occur. Nevertheless, the property owners expressed a fear of another extended disruption of their lives.

The trial court entered a written opinion and order fairly summarizing the essential facts, finding that the purpose of the easement included developing oil and gas interests but that purpose would not necessarily have been obvious to anyone else, that Savoy's use of the easement was necessary to its enjoyment thereof, but that the two periods of intense traffic during well and pipeline construction overburdened the easement. The trial court found that actual damages suffered by defendants would be impossible to calculate, and likewise it would be impossible to define with precision what conduct was unreasonable and what was not. The trial court found that it would be proper to require Savoy to pay to repair the road, and it enjoined Savoy "from using commercial vehicles [defined by 49 CFR 390.5 and MCL 480.11a(1)(b)] on Birch Valley Trail" and restricted any traffic to the hours of 10:00 a.m. and 4:00 p.m. except in emergencies. This appeal followed.

Savoy first argues that the trial court should have granted its motion for summary disposition in its entirety, and thus the matter should not have gone to trial at all. Specifically, it argues that the easement unambiguously grants Savoy a right of ingress and egress to explore and develop oil and gas, without any limitation, and everything Savoy did on or to the easement was necessary to permit its use. We disagree.

A grant or denial of summary disposition is reviewed de novo on the basis of the entire record to determine if the moving party is entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). When reviewing a motion under MCR 2.116(C)(10), which tests the factual sufficiency of the complaint, this Court considers all evidence submitted by the parties in the light most favorable to the non-moving party and grants summary disposition only where the evidence fails to establish a genuine issue regarding any material fact. *Id*. at 120. "We review the trial court's findings of fact in a bench trial for clear error and conduct a review de novo of the court's conclusions of law." *Chapdelaine v Sochocki*, 247 Mich App 167, 169; 635 NW2d 339 (2001). "The extent of a party's rights under an easement is a question of fact, and a trial court's determination of those facts is reviewed for clear error," but its ultimate "dispositional ruling on equitable matters," such as whether

equitable relief is proper under the facts as found, is reviewed de novo. *Blackhawk Development Corp v Village of Dexter*, 473 Mich 33, 40; 700 NW2d 364 (2005).

At one time, it was only possible to obtain easements by express grants. *Coolidge v Learned*, 25 Mass 504; 8 Pick (Mass) 504 (1829); *Frandorson Properties v Northwestern Mut Life Ins Co*, 744 F Supp 154, 156 (WD Mich, 1990). Plaintiff correctly points out that an express easement is, for all practical purposes, a contract and interpreted as such: the intent and understanding of the parties at the time the easement was created controls, and unambiguous language is enforced as written. *Wiggins v City of Burton*, 291 Mich App 532, 551-552; 805 NW2d 517 (2011). "The scope of an easement encompasses only those burdens on the servient estate that were contemplated by the parties at the time the easement was created." *Id*.

The language of the easement at issue here is undisputed: "for purposes of ingress, egress, and public utilities." None of those words appear to be unusual, difficult to define, or used in any seemingly odd context. Plaintiff reasonably cites a recent unpublished opinion of this Court addressing similar language. Although unpublished cases are not binding and reliance thereon is disfavored, we agree that in context the reference is entirely appropriate:

> In this case, the deed grants [the plaintiff] an easement for "ingress and egress." The deed does not define ingress and egress, so this Court may consult a dictionary to determine what these words commonly mean. See *Griffith v State Farm Mut Auto Ins Co*, 472 Mich 521, 526; 697 NW2d 895 (2005). "Ingress" is defined as "[t]he right or ability to enter; access," and "egress" is defined as "[t]he right or ability to leave; a way of exit." Black's Law Dictionary (10th ed). An "ingress-and-egress easement" is an easement that grants "[t]he right to use land to enter and leave another's property." Black's Law Dictionary (10th ed). Thus, the deed expressly granted [the plaintiff] the rights to enter and leave her 59–acre property, and her right to do so is paramount to [the defendant's] rights in the same property. [*Marilyn A Dzingle Trust v Platt*, unpublished opinion per curiam of the Court of Appeals, Docket No. 330614 (decided February 14, 2017).]

However, critically, no party actually disputes the right to enter and leave the property, making the above analysis accurate but largely tangential. Rather, the true dispute is, in practical effect, how obnoxiously one may go about entering and leaving the property, the extent to which one may physically alter the land under the easement in the process of doing so, and the extent to which entering and leaving the property may incidentally entail bringing anything else in or out of the property.

Notwithstanding what appears to be plain and unambiguous contractual language, it appears equally clear that considerable evidence demonstrates a latent ambiguity within the contract. See *Shay v Aldrich*, 487 Mich 648, 667-669; 790 NW2d 629 (2010). There was largely unanimous testimony to the general effect that a discrepancy existed between the historical makeup of Birch Valley Trail and its compatibility with continuous heavy industrial vehicle traffic, and Savoy's proposed use thereof. Furthermore, Howard was not the only party to the easement, and the neighbors who were *also* parties to the easement consistently testified that the area had historically been a quiet and isolated one. An easement holder generally may conduct repairs to an easement, but performing improvements is much less generously permitted,

requiring balancing between the necessity of such improvements for the easement holder with any additional burden placed on the servient estate. See *Blackhawk Dev*, 473 Mich at 41-42. There was ample testimony that Savoy's proposed use of Birch Valley Trail would require significant improvement thereof, and radically increased vehicular traffic would significantly degrade the value of the servient estates.

Savoy finally argues that the easement should be construed as "for the purpose of oil and gas exploration and exploitation" simply because elsewhere in the land contract "all oil, gas & mineral rights owned by Sellers" was included. This is a logical implication, but it suffers from the same problem of putting into conflict the extent to which one could do so without overburdening the servient estates. Consequently, the plain language of the easement does not settle the matter, and further factual development was necessary. The trial court properly denied in part Savoy's motion for summary disposition.

Savoy next argues that the trial court erred in finding that Savoy had overburdened the easement, the gravamen of its argument being that because its use thereof was entirely within the scope of the parties' original intent, it *per se* could not constitute overburdening of the servient estates. Savoy also notes that its heavy and objected-to use of the easement only occurred for a few months when the well was drilled and another few months when the pipeline was installed. We think Savoy makes fair points, but that they are too simple for the context at issue.

We first observe that the real problem in this matter is a common one that has never lent itself to simple and satisfactory resolutions: how to establish a "bright line" demarking the point at which a vague, nebulous understanding among what is effectively a semi-cohesive group has been exceeded by a newcomer. This is often of particular concern in rural areas where for many years "everyone knows" what is and is not acceptable, a stability and peace maintained less by the force of law than by the force of what the neighbors will think, only to one day have an outsider come in and force a need for an explicit rule. All too often, the only demarcation articulable by the local residents is some variation on "I know it when I see it," which is precisely the opposite of an objectively applicable rule. We think it a huge overstatement that Savoy could contend that it has the right to do *literally anything it wants* with the easement so long as it can be justified as involving ingress, egress, or oil and gas exploration. We think it equally absurd that one easement holder should be subject to rules not applied to all of them. Equity demands fairness to all parties. The trial court was therefore faced with an essentially impossible task of crafting an objective rule governing subjective expectations.

As noted, no party actually disputes Savoy's right to enter and exit the Howard property, and defendants' objections to the existence of the oil well is definitionally outside the scope of any arguments they could make about the easement. Furthermore, the testimony overwhelmingly shows that there are plenty of gas wells on various properties only accessible by the easement, as well as water wells, modular houses presumably delivered by heavy trucks, and a known history of Howard using some manner of heavy equipment to transport cattle. There was no dispute that drilling a gas well is a much less involved operation than drilling an oil well, but only in degree rather than in kind. Clearly, therefore, defendants cannot possibly object to the easement being used for heavy industrial vehicles *per se*. Likewise, defendants cannot possibly object *per se* to the easement being used to transport chattel of some sort. Analyzing parties' course of dealing (or course of performance, course of conduct, or similar terms for the

parties' historical conduct pertaining to each other and their execution of a contract) may be an appropriate way to resolve an ambiguity, at least under some circumstances. See *Schroeder v Terra Energy Ltd*, 223 Mich App 176, 191; 565 NW2d 887 (1997); see also *Detroit Police Officers Ass'n v City of Detroit*, 452 Mich 339, 345; 551 NW2d 349 (1996); Restatement Contracts 2d, § 209.

Savoy is therefore clearly within its rights under the easement to drive heavy industrial trucks and equipment upon it. The trial court erred to the extent it found otherwise. The issue remains, however, whether there is a limit to the *extent* of Savoy's use in such a manner.[1] The historical conduct of all parties on the easement clearly shows that *temporary* uses thereof by heavy industrial equipment for drilling wells is understood to be within its scope. It was also entirely undisputed that when the easement was created, there was no other way to get to the Howard property from a public road. The trial court unambiguously erred in concluding that using heavy commercial vehicles on Birch Valley Trail *per se* overburdened the easement. Furthermore, there is no unambiguous way to conclude that any particular temporal limit can be specified for the use of such vehicles. As a matter of equity, any restrictions placed on Savoy's use of the easement must be likewise placed on the other property owners whose properties are served by the easement. In other words, Savoy certainly cannot be held to have fewer rights to use the easement than anyone else.

Equity will also not ignore context, nor the practical effect a radical change in use of an easement will have on servient estates. The holder of an easement may perform "improvements" on the easement if they are reasonably necessary to the reasonable enjoyment of the easement *and* if they do not unreasonably burden the servient estate. *Blackhawk Dev*, 473 Mich at 41-42. Thus, the easement holder may simply not be able to fully exploit everything they wish to do with the easement even if technically permitted by the plain language of the grant, and the servient estate holder may simply have to accept some additional burdens. To resort to an extreme example, flattening the road and paving it to the entire 66-foot width of the easement would obviously effect a radical imposition upon the servient estates and be far more than necessary. To place some additional gravel and fill some potholes would equally obviously be entirely reasonable.

We think the only available objective resolution is to evaluate the extent to which the easement holder's desired use of the easement is intrinsically and necessarily incompatible with the physical road. The historical use of the road shows that it required some regular maintenance and supported some heavy commercial vehicular traffic. The testimony also overwhelmingly established that the road was significantly damaged by Savoy's prolonged use, Savoy's

---

[1] We note that Savoy would certainly have overburdened the easement by using it to transport pumpage from the well. So doing would have intrinsically converted Savoy's use of the easement from ingress and egress into using it as an industrial conveyor belt; in other words, for shipping, and a change in the kind of use put to the easement rather than merely a matter of degree. This would clearly exceed the scope of the easement: "[t]he use of an easement must be confined strictly to the purposes for which it was granted or reserved." *Delaney v Pond*, 350 Mich 685, 687; 86 NW2d 816 (1957). "Ingress and egress" does not necessarily include any traffic whatsoever. The testimony makes it clear, however, that Savoy's pipeline renders this particular concern moot.

maintenance of the easement was inadequate, and one particular hill was nearly impassable, at least after the road surface had degraded due to the Savoy's traffic. The evidence was that it would cost approximately a hundred thousand dollars and the equivalent of major surgery to upgrade the road to support continuous heavy industrial traffic. Furthermore, notwithstanding the testimony that drilling an oil well was a "round-the-clock" operation until its completion, radically increased noise and disruption of access by the other owners clearly imposes a significant burden on the servient estates. Indeed, noise alone can, depending on severity and context, be deemed an enjoinable nuisance. *Smith v Western Wayne Co Conservation Ass'n*, 380 Mich 526, 536; 158 NW2d 647 (1968). It was widely agreed that much of the appeal of property in the area was its quiet and isolation. The neighbors do not necessarily have a right to strictly maintain the status quo, however, depriving them of sleep for an extended period is essentially assaultive behavior.

We therefore reject Savoy's contention that the trial court erred in finding that Savoy had overburdened the easement, but we agree that the trial court's remedy went beyond equitably balancing reasonable needs and expectations and into impermissibly rewriting the easement. Notably, the trial court erred in precluding Savoy entirely from placing any heavy commercial traffic on Birch Valley Trail except in emergencies. All, or nearly all, of the owners of parcels served by Birch Valley Trail, or their predecessors, had made some kind of use of heavy commercial vehicles on the easement, and equity simply cannot permit Savoy to be restricted in its use of the easement more than any other easement holder. Similarly, the trial court erred in totally precluding Savoy from any non-emergency access between 4:00 p.m. and 10:00 a.m., for the same reason: no other easement holders are under that restriction.

Nevertheless, the error is one of excess narrowness more than intended purpose. The easement does not permit the destruction of the road with loads it is not capable of sustaining, radically upgrading the road to withstand traffic seriously out of historical character for the property, or disrupting neighbors' sleep or their own access to their properties for extended periods of time. It may not be possible to craft a clear demarcation of "how much is too much," but it should be clear that the occasional drilling of a gas well on the property is comfortably within what any easement holder may utilize the easement to do. At the other end of the spectrum, the easement may not be used as a commercial shipping corridor or used for the kind of intense traffic that wrecks the road or calls for its complete replacement. The trial court correctly determined that "ingress and egress" was ambiguous in context and that Savoy's extended imposition of heavy vehicular traffic on Birch Valley Trail overburdened the easement. However, the trial court's remedy, while sound in broad principle, went too far in the other direction.

We therefore vacate in part the trial court's order as to the specific rules it places on Savoy's use of the easement, and we remand for the trial court to consider a remedy that more fairly balances the equities as outlined in this opinion, a task we appreciate will be difficult. We affirm the trial court to the extent it concluded that Savoy's use of the easement in its construction of the well overburdened the easement. In light of testimony that another oil well on the property would not likely be profitable, the trial court may wish to consider imposing requirements with less specificity. The trial court may conduct further proceedings as it deems necessary to resolve the conundrum we are inflicting upon it.

Affirmed in part, vacated in part, and remanded for further proceedings. We retain jurisdiction. We direct that the parties shall bear their own costs, neither having prevailed in full.

/s/ Cynthia Diane Stephens
/s/ Douglas B. Shapiro
/s/ Amy Ronayne Krause

# Court of Appeals, State of Michigan

## ORDER

Savoy Energy LP v Leon Beasinger

Docket No. 336392

LC No. 14-015609-CH

Cynthia Diane Stephens
Presiding Judge

Douglas B. Shapiro

Amy Ronayne Krause
Judges

Pursuant to the opinion issued concurrently with this order, this case is REMANDED for further proceedings consistent with the opinion of this Court. We retain jurisdiction.

Proceedings on remand in this matter shall commence within 28 days of the Clerk's certification of this order, and they shall be given priority on remand until they are concluded. As stated in the accompanying opinion, the trial court is to consider a remedy that more fairly balances the equities as outlined in the opinion. The proceedings on remand are limited to these issues.

The parties shall promptly file with this Court a copy of all papers filed on remand. Within seven days after entry, appellant shall file with this Court copies of all orders entered on remand.

The transcript of all proceedings on remand shall be prepared and filed within 21 days after completion of the proceedings.

/s/ Cynthia Diane Stephens

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

May 10, 2018
Date

Chief Clerk