*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MARK COOPER,

      Plaintiff-Appellant/Cross-Appellee,

v

RAYMOND D. COMER, also known as RAY
COMER, CAROLYN COMER, NEW
ONONDAGA DRAGWAY, LLC, and DANIEL
L. PRANSHKA,

      Defendants-Appellees/Cross-
Appellants,

and

ONONDAGA TOWNSHIP,

      Intervenor.

UNPUBLISHED
March 14, 2019

No. 340303
Ingham Circuit Court
LC No. 13-001193-ND

---

GARY D. CALTRIDER TRUST, by GARY D.
CALTRIDER, Trustee,

      Plaintiff-Appellant,

v

RAYMOND D. COMER, also known as RAY
COMER, CAROLYN COMER, NEW
ONONDAGA DRAGWAY, LLC, and DANIEL
L. PRANSHKA,

      Defendants-Appellees,

and

No. 340304
Ingham Circuit Court
LC No. 14-000649-ND

ONONDAGA TOWNSHIP,

     Intervenor.

_____

MARK COOPER,

     Plaintiff-Appellee,

v

RAYMOND D. COMER, also known as RAY
COMER, CAROLYN COMER, NEW
ONONDAGA DRAGWAY, LLC, and DANIEL
L. PRANSHKA,

     Defendants-Appellants,

and

ONONDAGA TOWNSHIP,

     Intervenor,

and

LEXON INSURANCE COMPANY,

     Appellee.

No. 342137
Ingham Circuit Court
LC No. 13-001193-ND

_____

Before: SAWYER, P.J., and CAVANAGH and K. F. KELLY, JJ.

PER CURIAM.

In Docket No. 340303, Mark Cooper (hereinafter "Cooper"), appeals as of right the order finding the New Onondaga Dragway, LLC (hereinafter "the dragway"), located on the property of Raymond D. Comer and Carolyn Comer, and owned by Daniel L. Pranshka (hereinafter "defendants" when referred to jointly), to constitute a private nuisance, but denying Cooper an abatement premised on the unclean hands doctrine. On cross-appeal of the same order, defendants challenge the legal standard used by the trial court in finding that the dragway constituted a nuisance and the admissibility of expert evidence pertaining to the effects of sound emanating from the dragway. In Docket No. 340304, Gary D. Caltrider, as the trustee of the Gary D. Caltrider Trust (hereinafter "Caltrider"), appeals as of right the trial court's order granting in part and denying in part Caltrider's motion for reconsideration of the trial court's rulings on public nuisance and private nuisance with reference to his property. In Docket No.

-2-

342137, defendants appeal by leave granted[1] the trial court's order finding defendants were not wrongfully enjoined from operating the dragway and denying defendants' motion for judgment under the bond issued by Lexon Insurance Company. We affirm in part, reverse in part, and remand for further proceedings.

This litigation was initiated by property owners, Cooper and Caltrider, involving claims of nuisance for the operation of the New Onondaga Dragway, on property owned by the Comers in Onondaga Township. Cooper owns a residence and acreage located at 4189 Edgar Road, Leslie, Michigan, in Onondaga Township. The Cooper property is approximately .7 miles from the dragway. The Comers' property consists of agricultural acreage, with a dragway, at 4186 Bellevue Road, Leslie, Michigan, in Onondaga Township. Caltrider owns a mobile home park, known as Country Manor Mini Storage & Mobile Home Park, at 4400 Edward Road, Onondaga, Michigan.[2]

The asphalt where the current track exists originated in World War II, for use as a possible landing strip, and was operated as a dragway in the 1960s and 1970s, before closing down. Raymond Comer used the property for farming and livestock, with the blacktop area functioning as a feed lot since his ownership of the property in 1989. Conversion of the blacktop to a dragway was the idea of Raymond Comer's neighbor, Pranshka. Pranshka is the owner and operator of the dragway. Prior efforts to reopen the dragway in 1985 and 2009, by procurement of a special use permit (SUP) from the Onondaga Township Zoning Board, were unsuccessful. However, in 2012, the Comers again applied for a SUP, which was approved by the Onondaga Township Board on March 15, 2013, and the dragway began operations. Upon initiation of the operation of the dragway, plaintiffs filed complaints for public and private nuisance.

I. PRIVATE NUISANCE ABATEMENT AND THE UNCLEAN HANDS DOCTRINE

While concurring with the trial court's determination that the dragway constituted a private nuisance, Cooper contests the trial court's decision not to abate the nuisance or afford him any relief premised on the unclean hands doctrine.

This Court reviews equitable actions de novo and the trial court's factual findings for clear error. *McFerren v B & B Investment Group*, 253 Mich App 517, 522; 655 NW2d 779 (2002). "The clear error standard provides that factual findings are clearly erroneous where there is no evidentiary support for them or where there is supporting evidence but the reviewing court is nevertheless left with a definite and firm conviction that the trial court made a mistake." *Hill v City of Warren*, 276 Mich App 299, 308; 740 NW2d 706 (2007) (citation omitted).

---

[1] *Cooper v Comer*, unpublished order of the Court of Appeals, entered July 25, 2018 (Docket No. 342137).

[2] The title holder is the Caltrider Trust. The property consists of 39 mobile home units and two storage buildings comprised of 29 units. Approximately 100 people reside on the property, which is situated within hundreds of feet from the dragway. Caltrider's personal residence is approximately five miles away at 4719 Ferris, Onondaga, Michigan.

Although the trial court determined that the dragway constituted a private nuisance with regard to Cooper, it denied Cooper abatement of the nuisance generated by the dragway. The preclusion of equitable relief to Cooper was premised on the trial court's having found three areas of misconduct, constituting unclean hands. Specifically, the trial court found:

> (1) Cooper filed multiple articles of organization with the State of Michigan Corporations Division for assumed business names, all of which were variations of Onondaga Dragway; (2) Cooper intimidated a witness before the witness testified at the bench trial in this case; and (3) Cooper called the Chapman Agency, an insurance agency, and implied that he was a member of the Onondaga Township Board in an effort to obtain confidential information from the Chapman Agency regarding the Township's insurance policy.

The trial court opined that these incidents of "Cooper's misconduct [were] related to the present nuisance claim, albeit in varying degrees, and that the total misconduct is enough to warrant a finding of unclean hands on the part of Cooper and deny him the equitable relief he seeks." The trial court further opined, however, that while the filing of the articles of incorporation were not specifically related to nuisance, the actions by Cooper were undertaken "through fraudulent or deceptive tactics" to achieve the closure or impede the functioning of the dragway. The trial court also recognized in its ruling that Cooper's contact with the insurance company was "not specifically related to 'nuisance.' " The trial court explained:

> Cooper clearly engaged in a full-throttle effort to close the Dragway and he explored multiple avenues of relief, one of which is the present litigation. In so doing, Cooper filed articles of organization for the Dragway that he had no intention of using and misled an employee at the Chapman Agency in an effort to weaken the intervening party Township's litigation position. These actions may not directly relate to "nuisance," but they clearly relate to Cooper's claim before this Court, and they constitute misconduct sufficient to hold that Cooper acted with unclean hands.

The trial court further opined, even if the preceding actions were insufficiently related to the nuisance claims to comprise misconduct that precluded equitable relief, that Cooper's intimidation of the Onondaga Township Clerk, Diane Elaine Johnson, provided an "independent basis for a finding of unclean hands." After recounting the gist of Johnson's testimony, the trial court stated:

> It is clear Cooper sought to ensure Ms. Johnson testify in his favor, and such misconduct is an affront to the tribunal and the necessity that witnesses remain scrupulous. Witness intimidation is certainly an example of a "willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct," and Cooper's witness intimidation in this case is misconduct related to his nuisance claim such that this Court will bar his equitable relief under the clean hands doctrine.

From a historical perspective, the United States Supreme Court has discussed the unclean hands doctrine, explaining:

The guiding doctrine in this case is the equitable maxim that he who comes into equity must come with clean hands. This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be the abetter of iniquity. Thus while equity does not demand that its suitors shall have led blameless lives, as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue. [*Precision Instrument Mfg Co v Auto Maintenance Machinery Co*, 324 US 806, 814-815; 65 S Ct 993; 89 L Ed 1381 (1945) (citations and quotation marks omitted).]

It is worthy of emphasis that bad faith only rises to the level of applicability of the doctrine of unclean hands if the bad faith is "relative to the matter in which [the plaintiff] seeks relief." *Id*. at 814.

As similarly discussed by this Court in *McFerren*, 253 Mich App at 522 (citations and quotation marks omitted):

A court acting in equity looks at the whole situation and grants or withholds relief as good conscience dictates. A party seeking the aid of equity must come in with clean hands. The clean hands maxim is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.

A "succinct formulation of the doctrine" is "that one who seeks the aid of equity must come in with clean hands." *Rose v Nat'l Auction Group, Inc*, 466 Mich 453, 463; 646 NW2d 455 (2002). The long-recognized purpose underlying invocation of the unclean hands doctrine is "to protect the integrity of the Court." *Stachnik v Winkel*, 394 Mich 375, 386; 230 NW2d 529 (1975). "The misconduct which will move a court of equity to deny relief must bear a more or less direct relation to the transaction concerning which complaint is made. Relief is not denied merely because of the general morals, character or conduct of the party seeking relief." *McFerren*, 253 Mich App at 524 (citation omitted). With these strictures in mind, the trial court's reasons for denying an equitable remedy to Cooper are evaluated.

Although the trial court identified three instances of misconduct by Cooper to justify its denial of an abatement of the nuisance, the trial court recognized that two of the instances, the filing of the articles of incorporation and telephone contact with Onondaga Township's insurance agent, were not specifically related to the nuisance. Addressing the telephone contact, it is noteworthy that there is no discernible relationship between the one-time telephone call in an attempt to procure information on the Township's insurance contract and the existence of a nuisance perpetrated by the Comers, Pranshka and the dragway. This contact occurred in 2013, two years before the Comers even obtained the SUP. This lack of a temporal relationship to the alleged misconduct, when coupled with its absence of any relationship to the nuisance, does not

support application of the unclean hands doctrine. Application of the doctrine requires a relationship of the alleged misconduct with the nuisance, which is "the matter in which [Cooper] seeks relief," which is separate from any impropriety by plaintiff in having made the contact with the insurance agency for the Township. See *McFerren*, 253 Mich App at 524 ("The misconduct which will move a court of equity to deny relief must bear a more or less direct relation to the transaction concerning which complaint is made. Relief is not denied merely because of the general morals, character or conduct of the party seeking relief.").

Similarly, the trial court opined that Cooper's filing of the various articles of incorporation, while comprising a "deceptive tactic" designed to interfere with the operation of the dragway, was not specifically related to nuisance. It is significant that Cooper's actions in this regard occurred approximately one year after the issuance of the injunction that precluded the operation of the dragway. Once again, even viewing the actions as improper on the part of Cooper, it is difficult to construe the behavior as related to the nuisance, which would be necessary to impose the unclean hands doctrine in denying the abatement. *McFerren*, 253 Mich App at 522. The filings were intended to affect additional financial benefits available to the dragway and not the actual operation or the resultant nuisance.

This leaves the primary basis upon which the trial court relied to deny equitable relief – Cooper's alleged contact with, and intimidation of, Johnson before her testimony at trial. While not suggesting that the contact was proper, it similarly does not rise to the level necessary for imposition of the unclean hands doctrine and denial of abatement of the nuisance. Johnson testified with regard to conversations with Cooper in 2011, well before the issuance of the SUP or the opening of the dragway and the initiation of this litigation. Her most recent telephone conversation with Cooper occurred a week before her trial testimony wherein he informed Johnson that an individual was planning to challenge her in the next election for her position of Onondaga Township Clerk and suggested that the Township had jeopardized its immunity by intervening in the current litigation. Any mention of the risk of her involvement in a lawsuit based on her position with Onondaga Township occurred in 2011 and was not recent. When queried if Johnson felt threatened by Cooper's comment, she responded, "somewhat." Johnson asserted, and the trial court found, that the recent conversation with Cooper did not affect Johnson's testimony. Johnson acknowledged that her most recent discussion with Cooper did not encompass any mention of her anticipated trial testimony or the dragway, but instead was focused on the upcoming election and whether Johnson had sufficient support to maintain her elected position. Johnson admitted that Cooper never threatened her with a lawsuit and that her current concerns were related to any legal exposure premised on the actions of the Township.

Once again, while the contact initiated by Cooper to Johnson could be construed as improper, it was not related to the nuisance, which would be a requirement for application of the unclean hands doctrine. Johnson's testimony was, at best, tangential to the issue of nuisance, was related only to whether Onondaga Township had received complaints from the community regarding the dragway and was not determinative to the issue of the existence of the nuisance. While Cooper's actions were ill-advised and arguably reckless, a claim for equitable relief is not precluded under the unclean hands doctrine "merely because of the general morals, character[,] or conduct of the party seeking relief." *McFerren*, 253 Mich App at 524. "The misconduct which will move a court of equity to deny relief must bear a more or less direct relation to the transaction concerning which complaint is made[.]" *Id*. Thus, even if Cooper's actions reflected

-6-

an "improper motive," they were not sufficiently related to his nuisance claim. *Rutland Twp v City of Hastings*, 413 Mich 560, 565-566; 321 NW2d 647 (1982).

It would not be inappropriate for the trial court to impose a sanction to address Cooper's alleged misconduct. "[A] trial court has inherent authority to impose sanctions on the basis of the misconduct of a party or an attorney." *Persichini v William Beaumont Hosp*, 238 Mich App 626, 639; 607 NW2d 100 (1999). Despite finding the existence of a clear and intrusive nuisance, the trial court denied Cooper any abatement or relief premised on his alleged misconduct. Given this is an action in equity, the result is unreasonably harsh. Because Cooper improperly contacted a witness and initiated a discussion regarding her position, which was at most tangentially related to the issue of nuisance and acknowledged to be unrelated to the dragway, he was denied any relief. Thus, defendants may continue to engage with impunity in activity that comprises a recognized nuisance. Equitable relief will be denied when "the misconduct [is] directed at unrelated third parties," but only if the claims raised by the "plaintiff [are inextricably tied to the plaintiff's wrongdoing." *McFerren*, 253 Mich App at 524. In this instance, plaintiff's alleged misconduct is not sufficiently tied to the claim of nuisance to justify the denial of equitable relief for a clearly established private nuisance.

## II. VACATING OF ORDER ON REASSIGNMENT

Cooper asserts the trial court erred in the reassignment of this case from Judge Rosemarie E. Aquilina to Judge James S. Jamo. Cooper argues that it was improper for Judge Jamo to revisit and vacate Judge Aquilina's April 4, 2014 order, which granted summary disposition to Cooper on his nuisance complaint. Specifically, Cooper contends that Judge Jamo lacked the authority to vacate the April 4, 2014 order, and that permitting Onondaga Township to intervene in this matter comprised error and did not justify reassignment of this case.

This Court reviews the interpretation of court rules de novo. *Vyletel-Rivard v Rivard*, 286 Mich App 13, 20; 777 NW2d 722 (2009). A trial court's jurisdictional rulings are reviewed de novo. *Electrolines, Inc v Prudential Assurance Co, Ltd*, 260 Mich App 144, 163; 677 NW2d 874 (2003).

The procedural history pertinent to this issue is lengthy and convoluted, but begins with the initial grant of summary disposition by Judge Aquilina to Cooper on his claim of nuisance and denial of reconsideration of that ruling as requested by the Comers. After the grant of summary disposition in favor of Cooper, Onondaga Township filed a motion to intervene. Disputes also arose regarding the trial court's contemporary order to enjoin the operations of the dragway. In this time period, defendants filed a motion to disqualify Judge Aquilina, premised, in part, on the concurrent existence of a similar and earlier filed case involving John Ghere that had been assigned to and which was proceeding before Judge Jamo. Cooper filed a response to the various motions denying the need for reassignment, challenging the right of Onondaga Township to intervene, and arguing that the proper procedure would have been for defendants to appeal Judge Aquilina's grant of summary disposition. Defendants filed an amended motion for rehearing and reconsideration, asserting error for the failure of Judge Aquilina to recuse and terminate her involvement in the litigation because of her familiarity with the pending litigation involving Ghere, which defendants alleged resulted in Cooper's ability to forum shop.

On April 24, 2014, Judge Aquilina transferred this case to Judge Jamo based on the earlier filing and assignment of Ghere's litigation to Judge Jamo and the similarity of the relief being requested, but denied the request to stay proceedings or vacate her earlier orders. The order of reassignment was entered on April 25, 2014, and also granted Onondaga Township a right to intervene in Cooper's litigation.[3] Onondaga Township filed a motion for rehearing or reconsideration to allow the Township to participate in Cooper's earlier motion for summary disposition, with Cooper filing a response and objections.

Judge Jamo held hearings on May 23, 2014, and May 30, 2014. Judge Jamo granted Cooper's request for an injunction against the dragway and Onondaga Township's motion for rehearing of Cooper's summary disposition motion. The April 4, 2014 order, granting summary disposition to Cooper, was vacated and Cooper's motion for summary disposition was denied without prejudice. Later in the proceedings, Cooper also filed a separate motion for reentry of summary disposition and reinstatement of Judge Aquilina's April 4, 2014 order, and a supplemental motion, which Judge Jamo denied.

The starting point for this analysis is the broader or more general issue pertaining to Judge Jamo's authority to set aside an earlier order by Judge Aquilina after this case was reassigned. There are three relevant court rules. MCR 2.119(F) addresses motions for rehearing or reconsideration and states:

**(F) Motions for Rehearing or Reconsideration.**

(1) Unless another rule provides a different procedure for reconsideration of a decision (see, e.g., MCR 2.604[A], 2.612), a motion for rehearing or reconsideration of the decision on a motion must be served and filed not later than 21 days after entry of an order deciding the motion.

(2) No response to the motion may be filed, and there is no oral argument, unless the court otherwise directs.

(3) Generally, and without restricting the discretion of the court, a motion for rehearing or reconsideration which merely presents the same issues ruled on by the court, either expressly or by reasonable implication, will not be granted. The moving party must demonstrate a palpable error by which the court and the parties have been misled and show that a different disposition of the motion must result from correction of the error.

As noted, MCR 2.119(F)(1) references MCR 2.604(A), which provides in pertinent part:

(A) Except as provided in subrule (B), an order or other form of decision adjudicating fewer than all the claims, or the rights and liabilities of fewer than all the parties, does not terminate the action as to any of the claims or parties, and the

---

[3] The dragway was granted intervention even later in the litigation on July 25, 2014.

order is subject to revision before entry of final judgment adjudicating all the claims and the rights and liabilities of all the parties. Such an order or other form of decision is not appealable as of right before entry of final judgment. A party may file an application for leave to appeal from such an order.

In turn, MCR 2.613(B) states:

**(B) Correction of Error by Other Judges.** A judgment or order may be set aside or vacated, and a proceeding under a judgment or order may be stayed, only by the judge who entered the judgment or order, unless that judge is absent or unable to act. If the judge who entered the judgment or order is absent or unable to act, an order vacating or setting aside the judgment or order or staying proceedings under the judgment or order may be entered by a judge otherwise empowered to rule in the matter.

In *Hill*, 276 Mich App at 307, this Court discussed the interaction and application of MCR 2.119(F) and MCR 2.604(A), explaining:

As a general matter, courts are permitted to revisit issues they previously decided, even if presented with a motion for reconsideration that offers nothing new to the court. MCR 2.119(F)(3); *Smith v Sinai Hosp of Detroit*, 152 Mich App 716, 722-723; 394 NW2d 82 (1986). In any event, MCR 2.119(F)(1) explicitly refers to MCR 2.604(A) as "another rule" that "provides a different procedure for reconsideration of a decision. . . ." Under MCR 2.604(A), an order that does not dispose of all issues in a case does not terminate the action or entitle a party to appeal as of right and "is subject to revision before entry of final judgment adjudicating all the claims and the rights and liabilities of all the parties." The court rules therefore give the trial court explicit procedural authority to revisit an order while the proceedings are still pending and, on that reconsideration, to determine that the original order was mistaken, as the trial court did here.

It is also acknowledged that "a successor judge, as in this case, is empowered to make a revision to reflect a more correct adjudication of the rights and liabilities of the litigants." *Meagher v Wayne State Univ*, 222 Mich App 700, 718; 565 NW2d 401 (1997). In other words, "a successor judge has the authority to enter whatever orders his or her predecessor could have entered." *Dutton Partners, LLC v CMS Energy Corp*, 290 Mich App 635, 641 n 2; 802 NW2d 717 (2010), citing MCR 2.613(B). In addition, it is recognized that "[e]very tribunal, judicial or administrative, has some power to correct its own errors or otherwise appropriately to modify its judgment, decree, or order." *Pub Health Dep't v Rivergate Manor*, 452 Mich 495, 504; 550 NW2d 515 (1996).

Thus, in general, based on the referenced court rules and the reassignment of this litigation from Judge Aquilina to Judge Jamo, it was within Judge Jamo's authority to vacate the April 4, 2014 order. There are, however, complications. While the April 4, 2014 order does not indicate that it is a final order, the preceding order of March 28, 2014, denying the Comers' motion for reconsideration of the grant of summary disposition in favor of Cooper indicates that it addressed the last pending claim and closed the case. This raises a question regarding whether

Judge Jamo's May 30, 2014 order violated the requirements of MCR 2.604(A) by vacating a final order.

We find that Judge Jamo's actions in vacating the April 4, 2014 order were not in violation of the court rule. Clearly, the May 28, 2014 order was not a final order because on April 4, 2014, the trial court entered the written order granting Cooper's motion for summary disposition. The April 4, 2014 order takes precedence over Judge Aquilina's verbal ruling on March 17, 2014, as a trial court speaks through its written orders. *Oakland Co Prosecutor v Beckwith*, 242 Mich App 579, 590-591; 619 NW2d 172 (2000) ("It is well settled that courts speak through their written orders, not their oral statements."). In addition, having found a nuisance that required abatement, it remained incumbent on the trial court not simply to enjoin the nuisance but "to tailor the remedy to the problem, to abate the nuisance without completely destroying the business in which the nuisance originates." *Norton Shores v Carr*, 81 Mich App 715, 724; 265 NW2d 802 (1978). Specifically, "[e]quity will not abate a lawful continuing business as a nuisance when it is possible to eliminate objectionable features which infringe upon the ordinary rights of others." *Id*. While Judge Aquilina had determined the existence of a nuisance and the propriety of an injunction, it remained to be explored and determined whether the placement of restrictions on the operation of the dragway or requiring other actions to suppress sound at the dragway were feasible in defining the parameters of the injunction. As such, any designation that the grant of summary disposition to Cooper or the denial of reconsideration to the Comers were final orders comprises a mischaracterization or error.

Further, it is difficult to construe Judge Aquilina's order granting summary disposition to be a final order, given the decision to allow Onondaga Township and the dragway to intervene. At the very least, the dragway, as a corporate entity, was a necessary party to the litigation, and an order affecting the dragway without its inclusion in the litigation would have questionable validity and could not comprise a "final order," which is defined in MCR 7.202(6)(a)(i) as "the first judgment or order that *disposes of all the claims and adjudicates the rights and liabilities of all the parties. . . .*" (Emphasis added.)

Cooper further asserts that Judge Jamo was not authorized to vacate Judge Aquilina's order because she was not "unavailable" as required by MCR 2.613(B). In this instance, Cooper's litigation was reassigned by Judge Aquilina to Judge Jamo because Judge Jamo was handling a case viewed as involving similar issues pertaining to the dragway and the Comers' receipt of an SUP. The reverse situation was not a possibility – reassignment of the Ghere case to Judge Aquilina – because she identified a conflict of interest due to a prior professional relationship regarding Ghere. Judge Aquilina was no longer assigned to Cooper's litigation and was not unavailable in the traditional sense of having retired or left the bench because Judge Aquilina continued to serve as a judge in that circuit court. It would seem illogical, however, given Judge Aquilina's voluntary decision to reassign the ongoing responsibility for Cooper's litigation to Judge Jamo, to suggest that Judge Jamo should not be construed as the "successor judge," rendering Judge Aquilina as absent or unable to act. It would be confusing and untenable to allow a judge to relinquish control of a case to a coequal judge in the same circuit, but then allow the relinquishing judge to continue to engage in and rule on the litigation after the reassignment. Further, Judge Jamo's authority after the reassignment is bolstered by MCR 8.111(D)(1), which states: "If one of two or more actions arising out of the same transaction or

occurrence has been assigned to a judge, the other action or actions must be assigned to that judge."[4]

Cooper also challenges the propriety of the trial court's permitting Onondaga Township to intervene in this matter. Onondaga Township sought to intervene premised on its involvement in the issuance of the SUP that permitted the dragway to operate and to address implications that the Township Board had not fulfilled its obligations by permitting the dragway to operate. Onondaga Township also noted the pending existence of another case involving the issuance of the SUP for the dragway involving Ghere, noting similarities between the cases. Judge Aquilina granted Onondaga Township's request to intervene in the Cooper litigation.

Intervention is governed by MCR 2.209, which states, in relevant part:

**(A) Intervention of Right.** On timely application a person has a right to intervene in an action:

(1) when a Michigan statute or court rule confers an unconditional right to intervene;

(2) by stipulation of all the parties; or

(3) when the applicant claims an interest relating to the property or transaction which is the subject of the action and is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

**(B) Permissive Intervention.** On timely application a person may intervene in an action

(1) when a Michigan statute or court rule confers a conditional right to intervene; or

(2) when an applicant's claim or defense and the main action have a question of law or fact in common.

In exercising its discretion, the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

The term "intervention" is defined by *Black's Law Dictionary* (10th ed) as:

---

[4] Cooper's counsel was aware of the Ghere litigation (circuit court case no. 13-345-CZ), and identified its existence at the beginning of the verified complaint in complying with MCR 8.111(D)(3) and MCR 1.109(D)(2)(a), which placed the trial court and litigants on notice of the earlier existing litigation.

1. The entry into a lawsuit by a third party who, despite not being named a party to the action, has a personal stake in the outcome. See Fed R Civ P 24. • The intervenor sometimes joins the plaintiff in claiming what is sought, sometimes joins the defendant in resisting what is sought, and sometimes takes a position adverse to both the plaintiff and the defendant. Cf. impleader; interpleader; impleading. 2. The legal procedure by which such a third party is allowed to become a party to the litigation.

As explained by this Court:

The rule for intervention should be liberally construed to allow intervention where the applicant's interests may be inadequately represented. However, intervention may not be proper where it will have the effect of delaying the action or producing a multifariousness of parties and causes of action. [*Hill v LF Transp, Inc*, 277 Mich App 500, 508; 746 NW2d 118 (2008) (citations and quotation marks omitted).]

In this instance, Onondaga Township asserted its right to intervene based on the existence of a similar case, in which its decision to permit operation of the dragway and grant an SUP to the Comers was being contested. Onondaga Township's intervention request was justified by Cooper's pleadings in which he asserted that the operation of the dragway should be enjoined and that the SUP granted to the Comers should be declared invalid. Further, it is disingenuous of Cooper to contend that Onondaga Township lacked any interest in his litigation, given his ongoing assertions that the grant of the SUP was contrary to the Township's Master Plan and ordinances. Further, during the 39-day trial in this matter, a "special record" was developed wherein evidence and testimony were permitted on these issues, which are of undeniable and direct interest to Onondaga Township. As such, given the demonstrable interest of Onondaga Township and the potential for a ruling that could "impede the [Township's] ability to protect [its] interests," MCR 2.209(A)(3), the trial court did not err in granting the request for intervention.

III. LEGAL STANDARD – PRIVATE NUISANCE

While concurring with the trial court's decision to preclude equitable relief to Cooper, defendants assert that the trial court's ruling should be affirmed as the right result, albeit for the wrong reason. Specifically, defendants contended throughout the lower court proceedings and trial that the trial court erred and applied an incorrect legal standard in determining the presence of a private nuisance. Defendants asserted that, to find a private nuisance, the trial court was required to determine that the complained-of noise resulted in actual physical discomfort to persons of ordinary sensibilities. Instead, defendants argue that the trial court merely determined that the noise constituted an unreasonable interference or annoyance and that physical discomfort, as a necessary factor or element, was not established.

"Nuisance-abatement proceedings brought in the circuit court are generally equitable in nature. We review de novo the circuit court's equitable decisions, but review for clear error the findings of fact supporting those decisions." *Ypsilanti Charter Twp v Kircher*, 281 Mich App 251, 270; 761 NW2d 761 (2008). "The clear error standard provides that factual findings are

-12-

clearly erroneous where there is no evidentiary support for them or where there is supporting evidence but the reviewing court is nevertheless left with a definite and firm conviction that the trial court made a mistake." *Hill*, 276 Mich App at 308 (citation omitted). Issues of law are also reviewed de novo. *Jude v Heselschwerdt*, 228 Mich App 667, 670; 578 NW2d 704 (1998).

In finding that the dragway constituted a private nuisance with regard to Cooper, the trial court identified that "the proper standard for analyzing a nuisance based on sound or noise is whether or not the noise complained of would constitute an unreasonable interference for persons of ordinary sensibilities," which included "consideration [of] factors such as the location of the property and character of the community, the character, volume, time and duration of the noise, and all facts and circumstances of the specific case to define that 'person of ordinary sensibilities.' " The trial court determined that the noise from the dragway "unreasonably interferes with the Coopers' use and enjoyment of their property and causes them significant harm." The trial court relied on testimony elicited within the context of data obtained pertaining to the noise levels emanating from the dragway and the standards provided by the American National Standards Institute (ANSI) identifying "high levels of annoyance." In turn, the trial court found that an "annoyance so severe that it causes a systemic change in lifestyle habits and renders personal property unusable is no longer an annoyance, it is an interference." Thus, after evaluating the totality of the circumstances in this situation, the trial court determined that the interference caused by the dragway would lead a "person of ordinary sensibilities" to "consider the Dragway a nuisance." As noted, in reaching this conclusion, the trial court considered: (a) the character of the community, (b) the location of the Coopers' property, (c) the times and durations of the dragway's operation, (d) the character of the noise from the dragway (i.e., intermittency, startling spikes, engine rumbling), and (e) the sound measurements obtained during racing, which led the trial court to find that "the character and volume of the noise" was "extreme."

In general, a "nuisance" is defined as "an interference with the plaintiff's use and enjoyment of his land." *Morse v Colitti*, 317 Mich App 526, 554; 896 NW2d 15 (2016). "It is recognized in Michigan, as well as in other jurisdictions, that under certain circumstances noise may constitute a nuisance and may be enjoined." *Smith v W Wayne Co Conservation Ass'n*, 380 Mich 526, 536; 158 NW2d 463 (1968). This Court has consistently recognized:

> The elements of a private nuisance are satisfied if (a) the other has property rights and privileges in respect to the use or enjoyment interfered with, (b) the invasion results in significant harm, (c) the actor's conduct is the legal cause of the invasion, and (d) the invasion is either (i) intentional and unreasonable, or (ii) unintentional and otherwise actionable under the rules governing liability for negligent, reckless, or ultrahazardous conduct. To prove a nuisance, significant harm to the plaintiff resulting from the defendant's unreasonable interference with the use or enjoyment of property must be proven. [*Pine Bluffs Ass'n v DeWitt Landing Ass'n*, 287 Mich App 690, 729 n 23; 792 NW2d 18 (2010), quoting *Capitol Props Group, LLC v 1247 Ctr Street, LLC*, 283 Mich App 422, 431-432; 770 NW2d 105 (2009) (citations in *Capitol Props Group, LLC* omitted).]

Defendants contend that, in relying on the above elements, the trial court erred because it failed to recognize that, to be construed as a nuisance, a noise must result in actual physical

discomfort. It is uncertain whether defendants, premised on their arguments on appeal and in the trial court, are asserting that evidence of actual physical discomfort is an element to be proven for finding of a nuisance. Instead, for purposes of clarity, it is necessary to distinguish the difference between the elements for nuisance and those factors establishing significant harm and unreasonable interference. Therefore, when a noise is found to comprise a nuisance, to be eligible for recovery or rectification, the construct of physical discomfort provides a component of the "significant harm" and unreasonable interference that must be demonstrated.

Historically, our Supreme Court has stated the following applicable test:

To render noise a nuisance, it must be of such a character as to be of actual physical discomfort to persons of ordinary sensibilities. In applying this standard, the court states that consideration should be given to such additional factors as the character of the industry complained of, the character, volume, time and duration of the noise, and all the facts and circumstances of the case. [*Smith*, 380 Mich at 536.]

The Court noted that "time and locality factors have been given the greatest consideration by the court." *Id*. Earlier, in *Borsvold v United Dairies*, 347 Mich 672, 680-681; 81 NW2d 378 (1957), the Court explained, in detail:

American Jurisprudence offers the following general rules against which we test the trial judge's action:

'Generally, noise is not a nuisance per se, but it may be of such a character as to constitute a nuisance in fact, even though it arises from the operation of a factory, industrial plant, or other lawful business or occupation.

'To render noise a nuisance, it must be of such a character as to be of actual physical discomfort to persons of ordinary sensibilities. . . . There can be no fixed standard as to what noise constitutes a nuisance, and the circumstances of the case must necessarily influence the decision. To amount to a nuisance, the noise must be unreasonable in degree, and reasonableness in this respect is a question of fact. No one is entitled to absolute quiet in the enjoyment of his property; he may only insist upon a degree of quietness consistent with the standard of comfort prevailing in the locality in which he dwells. The location and surroundings must be considered, since noise which amounts to a nuisance in one locality may be entirely proper in another. The character and magnitude of the industry or business complained of and the manner in which it is conducted must also be taken into consideration, and so must the character and volume of the noise, the time and duration of its occurrence, the number of people affected by it, and all the facts and circumstances of the case.' 39 Am Jur, Nuisances, § 47, pp 330-333.

An even earlier decision of our Supreme Court recognized the following:

The question presented is whether these disagreeable noises in the nighttime in such close proximity to plaintiffs' dwelling constitute a nuisance which should be

abated by injunction. In considering the question whether noises furnish a ground for injunctive relief, it is observed . . . that:

"The authorities are numerous which hold that noise alone, or noise accompanied by vibration, if it be of such character as to be productive of actual physical discomfort and annoyance to a person of ordinary sensibility, may create a nuisance, and be the subject of an action at law, or an injunction from a court of equity, though such noise and vibration may result from the carrying on of a trade or business in a town or city. To have this effect the noise must be unreasonable in degree; and reasonableness in this respect is a question of fact, depending on the character of the business, the manner in which it is conducted, its location and relation to other property, and the other facts and circumstances of the case. The number of people concerned by the noise and the magnitude of the industry complained of are both elements entitled to consideration in reaching a conclusion as to the fact. And again, the time at which noises are made is an element to be considered in determining whether a noise constitutes an actionable nuisance. A noise incident to the operation of machinery during the day may not be a nuisance, while the same noise during the usual sleeping hours of the night would constitute a nuisance. And noises made on Sunday may constitute a nuisance, though they would not have been such if made on a weekday." [*Kobielski v Belle Isle East Side Creamery Co*, 222 Mich 656, 659-660; 193 NW 214 (1923) (citation and quotation marks omitted).]

Our Supreme Court has more recently indicated:

[T]he gist of a private nuisance action is an interference with the occupation or use of land or an interference with servitudes relating to land. There are countless ways to interfere with the use and enjoyment of land including interference with the physical condition of the land itself, disturbance in the comfort or conveniences of the occupant including his peace of mind, and threat of future injury that is a present menace and interference with enjoyment. The essence of private nuisance is the protection of a property owner's or occupier's reasonable comfort in occupation of the land in question. It involves "not only a defect, but threatening or impending danger . . . to the property rights or health of persons sustaining peculiar relations to the same. . . ." [*Adkins v Thomas Solvent Co,* 440 Mich 293, 303; 487 NW2d 715 (1992) (citations omitted).]

Distinguishing between trespass and nuisance, and citing *Adkins*, this Court has explained:

To prevail in nuisance, a possessor of land must prove *significant harm* resulting from the defendant's *unreasonable interference* with the use or enjoyment of the property. Thus, in nuisance, the plaintiff must prove all damages, which may be awarded only to the extent that the defendant's conduct was "unreasonable" according to a public-policy assessment of its overall value. [*Adams v Cleveland-Cliffs Iron Co*, 237 Mich App 51, 67; 602 NW2d 215 (1999).]

-15-

Defendants' argument lacks merit for two reasons: (1) to establish a noise as a nuisance, a plaintiff need not demonstrate physical discomfort as an element of nuisance, but rather as part of the "significant harm" that results from an "unreasonable interference with the use or enjoyment of [their] property," and (2) physical discomfort does not necessarily equate to physical illness or a medical condition. Specifically, defendants appear to improperly conflate the concept of physical discomfort with the actual incurrence of a health issue. As such, defendants' premise is mistaken.

In finding that the dragway constituted a private nuisance for Cooper, the trial court stated "the proper standard for analyzing a nuisance based on sound or noise is whether or not the noise complained of would constitute an unreasonable interference for persons of ordinary sensibilities." In making such a determination, the trial court recognized it was to consider "factors such as the location of the property and character of the community, the character, volume, time and duration of the noise, and all facts and circumstances of the specific case to define that 'person of ordinary sensibilities.' " The trial court found that the dragway constituted an unreasonable interference with the ability of the Coopers to use and enjoy their property, which resulted in a finding of significant harm. A plethora of testimony was elicited from the Coopers, and others in the community, complaining about the volume and character of the noise generated by the dragway. The dragway operates for extended periods of time on Friday afternoons into the evening, as well as the entirety of the day on Saturdays from spring into the fall months, which coincides with the time periods most individuals are at their homes and trying to take advantage of the personal environments they have created.

With regard to the concept of significant harm, numerous witnesses testified to the disruptive and disconcerting nature of the sound emanating from the dragway, describing it as interrupting their abilities to entertain at their homes, watch television, and to read or engage in routine conversations because of the noise level and the unpredictable spikes in sound due to the racing. According to Cooper, the public address system at the dragway was discernible, even with his windows closed, at 7:00 a.m. on Saturdays, and the noise of the dragway precludes the ability to keep windows open at his home. Cooper described being able to feel the vibration from the dragway and the disturbing nature of the noise generated by the racing to himself, members of his family, and pet. Susan Cooper confirmed that the noise from the dragway interfered with activities, actually driving her from the family home on race days because it was "unbearably loud." Susan Cooper asserted she could physically feel the vibration from the dragway, which resulted in stress and discomfort. The emergency medical technician (EMT) for the ambulance company stationed at the dragway during racing, Christopher D. Johnson, described the volume and characteristics of sound when on the dragway, indicating its deafening nature and resultant headaches. Cooper's sound measurement expert, Richard D. James, an acoustical engineer, testified to feeling the vibration from the dragway while on Cooper's property and hearing the public address system. James quantified the variance in sound levels experienced on the Cooper property from ambient noise levels, interpreting the level of noise in the context of the ANSI standards, to determine that what was being experienced exceeded annoyance and fell within the realm of "intolerable." In turn, another expert proffered by Cooper, Dale Robinson, Ph.D., an audiologist, provided testimony on the negative effects of noise regarding the impairment or interference with cognitive functioning as well as its distractive components, referencing specific data obtained by James.

Having taken into account the totality of the circumstances, including: (a) the rural and residential character of the community, (b) the level and type of noise being generated, as well as its frequency and variability, (c) the times and duration of occurrence of the noise, and (d) evidence pertaining to the disruptive nature of the noise and its level of interference with the ability to live at and enjoy the use of the Cooper property, the trial court did not err in finding both the existence of a private nuisance and that the resultant nuisance caused significant harm. Thus, the trial court did evaluate physical discomfort to Cooper attributable from the dragway within its determination that significant harm and unreasonable interference had resulted from the dragway's operation.

## IV. ADMISSIBILITY OF EXPERT TESTIMONY

On cross-appeal, defendants continue to challenge the trial court's rulings regarding the admissibility of expert testimony proffered by plaintiffs through James and Robinson. With regard to the testimony elicited from James, defendants assert it was error for the trial court to permit James to opine on the effects of sound on the health of individuals or the community, including whether particular sounds or their levels constituted an annoyance given James's lack of qualification to opine on this issue. In addition, defendants asserted that the testimony pertaining to the effect of noise on the community was not relevant to a determination of whether the noise constituted a private nuisance to Cooper. According to defendants, James's testimony should have been limited solely to the sound measurements taken. Defendants also question the trial court permitting testimony by Robinson on low-frequency sound, asserting the testimony did not meet the strictures of MRE 702. In addition to disqualification of Robinson's testimony on subaudible sound, according to defendants, the trial court should have precluded his testimony on low-frequency sound based on Robinson's acknowledged lack of involvement or expertise in this area. Defendants dispute that either James or Robinson was qualified to testify regarding ANSI standards and that the ANSI standards failed to determine or support any claim that the dragway sounds caused physical discomfort to Cooper or others in the community.

"[T]his Court reviews a trial court's rulings concerning the qualifications of proposed expert witnesses to testify for an abuse of discretion. An abuse of discretion occurs when the decision results in an outcome falling outside the principled range of outcomes." *Woodard v Custer*, 476 Mich 545, 557; 719 NW2d 842 (2006). On appeal, this Court reviews "a trial court's ruling admitting or excluding expert testimony for an abuse of discretion." *Barr v Farm Bureau Gen Ins Co*, 292 Mich App 456, 458; 806 NW2d 531 (2011). Notably, "[u]nder MRE 103(a)(1), error may not be predicated on a ruling admitting or excluding evidence unless a substantial right is affected. A close evidentiary ruling ordinarily cannot be an abuse of discretion." *Barr*, 292 Mich App at 458.

At the outset, it is useful to identify the testimony admitted and restricted by the trial court with regard to James and Robinson at trial. James was qualified as a witness in the area of sound measurement and with reference to the specific measurements he procured from Cooper's and other properties near the dragway. The parties stipulated that James was not qualified as an expert witness and could not testify regarding the health effect of the dragway noise on individuals. The trial court recognized, initially taking under advisement, issues pertaining to the admissibility of testimony by James regarding the effect of noise on the community. In its later ruling, at the conclusion of the proceedings, the trial court made a significant observation and

-17-

distinguished between testimony proffered from James regarding the health effects attributable to noise and the effects of noise on the community. Specifically, the trial court suggested that defendants improperly tried to blur the lines between and conflate these concepts. The trial court recognized that noise can affect a community in ways other than involving health concerns. The trial court did admit the ANSI report into evidence because it represented professional, objective, and acknowledged standards "for noise and its effects on humans." In particular, the trial court noted that the standards developed by ANSI are "accepted and used by the [federal] government and courts across the country."

With reference to Robinson, the trial court precluded any testimony elicited from him regarding subaudible sound, with the commensurate redaction of Robinson's testimony on this subject during deposition.[5] Testimony or evidence regarding low-frequency sound was found to be admissible; with the trial court noting that both Robinson and James testified about the low-frequency sounds emanating from the dragway on race days and that such sounds can be "annoying" and "disruptive" to those in physical proximity to the dragway. Significantly, the trial court indicated that Robinson and James in providing their opinions relied on and referred to the ANSI report, which contains information on the effect of low-frequency sounds on humans. Based on the recognition and professional acceptance of the ANSI standards, it was logical for the trial court to reject defendants' argument that standards had not been developed regarding low-frequency sounds or that the concept constituted "junk science." Because the ANSI report discussed and addressed continuous low-frequency sounds, an established scientific basis for James's testimony regarding his measurement of such sounds from the dragway was deemed admissible by the trial court. Defendants were also able to present the testimony of their own expert, Richard A. Kolano, to dispute the assertions by James and the accuracy of his measurements, as well as offer alternative standards, such as those used by the Department of Housing and Urban Development (HUD) and the Environmental Protection Agency (EPA), to apply to the sound measurements from the dragway.

> In accordance with MRE 702:
>
> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Further standards for a court's consideration when determining the admissibility of expert testimony are also found in MCL 600.2955(1), which states:

---

[5] At deposition, defendants accepted Robinson as an expert on auditory sound, objecting only to his testimony on subaudible and low-frequency sound.

(1) In an action for the death of a person or for injury to a person or property, a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact. In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:

(a) Whether the opinion and its basis have been subjected to scientific testing and replication.

(b) Whether the opinion and its basis have been subjected to peer review publication.

(c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.

(d) The known or potential error rate of the opinion and its basis.

(e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

(f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

(g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

On appeal, defendants do not dispute that James's testimony on the measurements of sound he recorded was admissible. Rather, defendants argue that James's testimony regarding the effect of the sound from the dragway on the community was inadmissible because of the lack of expertise by James on that subject, and that the testimony regarding the effect of the dragway noise on the community was irrelevant to whether it constituted a private nuisance for Cooper. In large part, defendants' objections and criticisms of James focused on the methodologies used by James to record and playback the dragway sounds, suggesting the methods used did not comport with professional standards. Notably, James explained the sound level data obtained with comparison and interpretation to the official standards developed and published by the ANSI. Specifically, James reported the decibel readings for various recordings and locations. In turn, the recorded levels were then compared to threshold standards established by ANSI, degrees of variance were objectively determined, and the effect of the variances were interpreted in conjunction with the ANSI standards. By way of example, James relied on the ANSI standards to assert that a variance exceeding 15 dB is identified as "objectionable" by the ANSI, with variances in excess of 20 dB deemed "objectionable to intolerable." James also opined, based on his recordings of the dragway, in the context of the ANSI standards, about the effects of short, fluctuating noises and low-frequency sounds as they related to the "concept of vibration."

-19-

In sum, James's testimony encompassed the methodology and sound recordings obtained from specified locations in the vicinity of the dragway on a race day. James then described and explained the sound levels measured and recorded within the context of the standards set forth by the ANSI, which are accepted and recognized within the industry of sound and acoustic engineering. In other words, James used recognized scientific methods to collect data and identified accepted standards regarding sound and its effects to examine and opine on the level of noise being generated by the dragway and its effect on the nearby community.

Defendants were afforded an adequate opportunity, which they used, through the testimony of their own expert, Richard A. Kolano, to challenge James's methodology, sound measurement accuracy, the standards to be applied and the interpretation of the data in relation to those standards. When viewed in context, many of defendants' objections actually comprised challenges to the weight to be afforded to the disputed expert testimony rather than its admissibility. It is routinely recognized that "an opposing party's disagreement with an expert's opinion or interpretation of facts, and gaps in expertise, are matters of the weight to be accorded to the testimony, not its admissibility." *Bouverette v Westinghouse Electric Corp*, 245 Mich App 391, 401; 628 NW2d 86 (2001).

In admitting James's testimony, the trial court fulfilled its "gatekeeper" functions and applied the tests of reliability dictated by MRE 702 and MCL 600.2955. Because James's testimony comported with MRE 703, which requires that "the facts or data in the particular case upon which an expert bases an opinion or inference shall be in evidence," it was admissible.

Similarly, defendants objected to the admissibility of de benne esse testimony of Robinson regarding the existence, measurement and effect of subaudible and low-frequency sounds. Before determining admissibility of this testimony, the trial court explained and acknowledged its gatekeeping role in accordance with MRE 702 and MCL 600.2955. The trial court precluded the admission of testimony on subaudible sounds, but found that testimony regarding low-frequency sounds required further exploration and consideration. After the redaction of the testimony regarding subaudible sound, the transcript of Robinson's deposition was admitted, wherein he opined on his concerns for children on the Cooper and Caltrider properties based on the audible noise levels recorded by James and the intermittency of those sounds. Robinson discussed the negative effects of the noise, acknowledging that it would not induce hearing loss but would impair other cognitive functioning, such as reading and communication and could also result in "tiredness, irritability and headaches" for children. For adults, exposure to the sound would interfere with conversation and concentration, with levels of annoyance experienced increasing with variation in the intermittency of the sound.

In ultimately ruling on the admissibility of Robinson's testimony regarding low-frequency sounds, the trial court observed that Robinson and James testified "to varying extents, about low-frequency sound emanating from the Dragway . . . and how that sound can be 'annoying' and disruptive for those nearby." The trial court noted that, in expressing their opinions, James and Robinson relied on and referenced the ANSI report, which included information on the effect of low-frequency sounds on humans. As such, the trial court rejected defendants' contentions regarding the "absence of recognizable standards pertaining to the effects of low-frequency sounds," and noted that the elicited testimony was in conformance with the ANSI standards. The trial court did not err in determining this testimony to be admissible.

-20-

## V. DISMISSAL OF CALTRIDER NUISANCE CLAIMS

Caltrider asserts the trial court erred in dismissing his claims of public and private nuisance. Caltrider contends that he did not bring this claim on behalf of the tenants of his trailer park and, therefore, any determination regarding Caltrider's lack of standing on this basis comprised error. The trial court also erred in finding, despite evidence of economic damages attributable to the dragway, that Caltrider was not entitled to damages or relief.

As recently discussed in *Stock Bldg Supply, LLC v Crosswinds Communities, Inc*, 317 Mich App 189, 198-199; 893 NW2d 165 (2016) (citations and quotation marks omitted):

This Court reviews decisions on motions for summary disposition de novo to determine if the moving party was entitled to judgment as a matter of law. A motion for summary disposition pursuant to MCR 2.116(C)(10) tests the factual sufficiency of the complaint. In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion. Summary disposition under MCR 2.116(C)(10) is proper when there is no genuine issue regarding any material fact. A reviewing court may not employ a standard citing the mere possibility that the claim might be supported by evidence produced at trial. A mere promise is insufficient under our court rules. While it is true that the trial court must consider affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, the nonmoving party may not rely on mere allegations or denials, but must set forth specific facts that show that a genuine issue of material fact exists. Equitable issues are reviewed de novo[.]

In addition, the applicability of a legal doctrine comprises a question of law, *Wigfall v Detroit*, 322 Mich App 36, 43; 910 NW2d 730 (2017), which is reviewed de novo, *Cherry Growers, Inc v Agricultural Mktg & Bargaining Bd*, 240 Mich App 153, 160; 610 NW2d 613 (2000). "A trial court's findings of fact supporting its decision are reviewed for clear error." *Wigfall*, 322 Mich App at 43. Specifically, "[w]hen reviewing a grant of equitable relief, we will set aside the trial court's findings of fact only if they are clearly erroneous, but whether equitable relief is proper under those facts is a question of law that we review de novo." *Gleason v Kincaid*, 323 Mich App 308, 317; 917 NW2d 685 (2018). "The clear error standard provides that factual findings are clearly erroneous where there is no evidentiary support for them or where there is supporting evidence but the reviewing court is nevertheless left with a definite and firm conviction that the trial court made a mistake." *Hill*, 276 Mich App at 308. "The question whether a party has standing presents a question of law reviewed de novo on appeal." *Tennine Corp v Boardwalk Commercial, LLC*, 315 Mich App 1, 7; 888 NW2d 267 (2016).

The Caltrider Trust owns the mobile home park involved in this claim, with Caltrider's personal residence at a different location. Caltrider asserted that the noise from the dragway was disturbing and interfered with his ability to maintain conversations with his tenants when the dragway was operating and that he could feel the vibration generated by the vehicles when racing while he was at the mobile home park. On May 20, 2015, the trial court dismissed

Caltrider's claim of public nuisance based on the failure "to allege interference of [sic] any special interest not common to the community," and found that the potential for economic damages pertaining to resale of the property did not serve to provide a sufficient distinction to sustain a claim of public nuisance. The trial court found Caltrider's damages were not unique because the only variance identified was in regard to the degree the same damages were suffered by other members of the community, i.e., loss in property values. The trial court also rejected Caltrider's efforts to establish standing based on "his interest in protecting children who reside in his mobile home park[.]"

A "public nuisance" has been defined "as an 'unreasonable interference with a common right enjoyed by the general public'." *Capitol Props Group, LLC*, 283 Mich App at 427 (citation omitted).

> The term "unreasonable interference" includes conduct that (1) significantly interferes with the public's health, safety, peace, comfort, or convenience, (2) is proscribed by law, or (3) is known or should have been known by the actor to be of a continuing nature that produces a permanent or long-lasting, significant effect on these rights. A private citizen may file an action for a public nuisance against an actor where the individual can show he suffered a type of harm different from that of the general public. [*Id*. at 427-428 (citation omitted).]

In this instance, numerous individuals in the community, in addition to Caltrider, testified or provided affidavits, indicating that operation of the dragway comprised an "unreasonable interference" with the peace, comfort and enjoyment of their personal properties. As such, Caltrider provided evidence that his "grievance extends to the public, beyond the walls" or limits of his property. *Id*. at 431. However, Caltrider was unable to demonstrate that the type of harm he incurred differed from that suffered by the general public. *Id*. at 428. Innumerable individuals, in addition to Caltrider, complained that the noise from the dragway interfered with the peaceful enjoyment of their properties and was disruptive. Caltrider did not identify how the dragway resulted in his experiencing a harm that was discernibly different from that of other individuals in the community.

Caltrider implied that the noise generated by the dragway and its especially close proximity to the mobile home park made it difficult to procure tenants or maintain rentals of his living units. To that end, testimony elicited from Edwin Terry Shellhorn, a real estate broker, suggested that the dragway would negatively affect the valuation of Caltrider's property, providing the example of a separate residential property where the buyer elected not to conclude a sale after learning of the dragway's existence and that the property later resold for less than the 2015 sale price. Caltrider, however, did not provide any data or evidence showing fluctuations or increases in mobile home park vacancies and decreases in occupancy rates, failures to renew tenancies that were attributable to the existence and operation of the dragway, or comparisons to pre-dragway rental figures. In addition, the Michigan Supreme Court "has held that property depreciation alone is insufficient to constitute a nuisance." *Capitol Props Group, LLC*, 283 Mich App at 432, citing *Adkins*, 440 Mich at 312. As such, the trial court was justified in dismissing Caltrider's public nuisance claim.

With regard to the issue of private nuisance, it is recognized:

The elements of a private nuisance are satisfied if (a) the other has property rights and privileges in respect to the use or enjoyment interfered with, (b) the invasion results in significant harm, (c) the actor's conduct is the legal cause of the invasion, and (d) the invasion is either (i) intentional and unreasonable, or (ii) unintentional and otherwise actionable under the rules governing liability for negligent, reckless, or ultrahazardous conduct. To prove a nuisance, significant harm to the plaintiff resulting from the defendant's unreasonable interference with the use or enjoyment of property must be proven. [*Capitol Props Group, LLC*, 283 Mich App at 431-432 (citations omitted).]

While the trial court recognized Caltrider's standing to assert a claim of private nuisance, it found that a private nuisance was not established because the harm or interference Caltrider asserted, involving his inability to maintain conversations outdoors with tenants of the mobile home park on race days, did not rise to an "unreasonable interference with the use or enjoyment of the property." Specifically, racing occurred primarily on Friday evenings and Saturdays. As such, Caltrider was able to engage in unimpeded conversations with tenants at least five other days during the week when out of doors. In addition, although Caltrider could hear the dragway when in his office, it was basically acknowledged that he could sufficiently communicate with his tenants when indoors, despite operation of the dragway. As such, under the totality of the circumstances, while noise from the dragway constituted an interference with the use and enjoyment of the property, the interference for Caltrider was deemed limited and not "unreasonable."

Caltrider's standing to bring a public or private nuisance claim was also challenged by defendants. The trial court found that Caltrider lacked standing to assert a public nuisance claim but that Caltrider had standing for his claim of private nuisance. With regard to the concept of standing, this Court has explained:

The standing doctrine's purpose is to determine whether a litigant has a sufficient interest in the matter to "ensure sincere and vigorous advocacy." The standing requirement ensures that only those with a substantial interest may litigate a claim in court. When a party's standing is contested, the issue becomes whether the proper party is seeking adjudication, not whether the issue is justiciable. Standing is not contingent on the merits of the case. Standing may be conferred by legislative expression or implied by duties that arise from the law. [*Tennine Corp*, 315 Mich App at 7 (citations omitted).]

With regard to Caltrider's public nuisance claim, the trial court did not err in finding he lacked standing because he did not suffer from a different type of harm than that of the general public. Caltrider's private nuisance claim was not denied by the trial court on the basis of standing, but rather the failure to demonstrate an "unreasonable" harm.

Finally, Caltrider asserts it was error to not grant him an abatement of the nuisance. On the surface, there appears to be a discrepant determination based on the trial court's finding of the existence of a private nuisance with regard to Caltrider's neighbor, Cooper. However, Caltrider cannot demonstrate an entitlement to a remedy when he has failed to establish the existence of a wrong to him personally subject to recompense or abatement. First, this Court has

-23-

historically rejected claims of "standing . . . by virtue of . . . ownership of property adjoining" or abutting property whose owner has standing and established a nuisance or grievance. *Village of Franklin v City of Southfield*, 101 Mich App 554, 557-558; 300 NW2d 634 (1980). In other words, standing is not conferred simply because of proximity to the alleged nuisance, absent the demonstration of special damages. The absence of a demonstrable legal wrong precludes the requirement of a remedy, such as abatement. See *Reynolds v Great Northern R Co*, 69 F 808, 813 (CA 8, 1895) ("Where there has been no such failure, there has been no wrong, and therefore there is no remedy.").

The trial court did not err in dismissing Caltrider's public and private nuisance claims. Having found that Caltrider had failed to establish a private nuisance, the remedy of abatement was not available.

## VI. DISBURSEMENT OF SURETY BOND

Defendants assert the trial court erred in denying their request to disburse the proceeds of the surety bond, arguing that the denial of Cooper's request for abatement of the nuisance resulted in defendants being the prevailing parties in the litigation and triggered the conditions for payment of the surety bond. Specifically, defendants contend that Cooper's actions, which resulted in the finding of "unclean hands," were ongoing before the initiation of the litigation and issuance of the injunction, continued through trial, and led to the improper imposition of the injunction.

"This Court reviews de novo a trial court's resolution of issues of law, including the interpretation of statutes and court rules." *State Treasurer v Bences*, 318 Mich App 146, 149; 896 NW2d 93 (2016). "[T]his Court reviews de novo a trial court's interpretation of contractual language." *Westfield Ins Co v Ken's Serv*, 295 Mich App 610, 615; 815 NW2d 786 (2012).

MCR 3.310(D)(1) provides:

Before granting a preliminary injunction or temporary restraining order, the court may require the applicant to give security, in the amount the court deems proper, for the payment of costs and damages that may be incurred or suffered by a party who is found to have been wrongfully enjoined or restrained.

In this instance, Cooper was required to post a surety bond in the amount of $381,000, which was specifically identified "for the payment of costs and damages that may be incurred or suffered by said defendants *if they are found to have been wrongfully enjoined or restrained.*" The trial court determined that defendants were not entitled to payment on the surety bond, finding "that the preliminary injunction in this case was not issued wrongfully[.]" Evaluating the decision to issue the injunction on May 30, 2015, the trial court found that it had properly considered the relevant factors, and that issuance of the injunction was justified by the proofs submitted. In denying payment on the surety bond, the trial court further noted that Cooper had carried his burden given the trial court's ultimate ruling that defendants' operation of the dragway constituted a private nuisance with regard to Cooper. When considering a "temporal" method or analysis, the trial court reviewed the various acts and timing of the identified incidents of misconduct by Cooper before the litigation initiated and during the trial. Finding the

application of the unclean hands doctrine was the result of witness intimidation, which the trial court determined occurred during the trial, the trial court concluded that, because the relevant "misconduct did not occur until trial[,] . . . [d]efendants were not wrongfully enjoined throughout the pendency of the litigation."

It has historically been recognized by this Court that "[t]he word 'wrongful,' as used in the context of injunctions, has been considered by federal and state courts to mean the issuance of the injunction by a court in error or when it ought not to have been issued." *Matter of Estate of Prichard*, 169 Mich App 140, 149; 425 NW2d 744 (1988). "The action on the security, often in the form of an 'injunction bond,' is treated as an action on a contract and not a proceeding in equity, although the allowance of damages has been treated in some courts as resting on equitable principles." *Id*. In accordance with MCR 3.604(I)(1):

> In an action in which a bond or other security has been posted, judgment may be entered directly against the surety or the security on motion without the necessity of an independent action *on a showing that the condition has occurred giving rise to the liability on the bond* or to the forfeiture of the security. [Emphasis added.]

Because bonds, such as the surety bond at issue, are construed under the laws of contract, and given the strictures of MCR 3.604(I)(1), the language of the bond is controlling. As is routinely recognized:

> This Court must examine the language of the contract and accord the words their ordinary and plain meanings, if such meanings are apparent. If the contractual language is unambiguous, courts must interpret and enforce the contract as written. Thus, an unambiguous contractual provision is reflective of the parties' intent as a matter of law. [*In re Smith Trust*, 274 Mich App 283, 285; 731 NW2d 810 (2007), aff'd 480 Mich 19 (2008) (citations and quotation marks omitted).]

At the outset, based on the language of the surety bond stating that it is restricted to "the payment of costs and damages that may be incurred or suffered by said defendants *if they are found to have been wrongfully enjoined or restrained*," it is difficult to construe how the payment provision of the bond is triggered given the trial court's determination that defendants' actions constituted a private nuisance to Cooper. On its face, it appears illogical to suggest that, Cooper having prevailed given the trial court's legal determination that the operation of the dragway comprised a private nuisance, the trial court could also concomitantly find that the issuance of the injunction to enjoin that behavior was wrongful. Superficially, defendants appear to confuse or fail to distinguish between Cooper having prevailed on the merits of the claim that led to the issuance of the bond and Cooper's failure to obtain, or lack of entitlement to, a remedy for the wrong incurred.

Defendants assert, however, that a finding of nuisance does not equate to or establish that the issuance of the injunction was proper, or not wrongful. To that end, defendants suggest that Cooper's identified acts of misconduct both before and during trial, negated the basis for issuance of the injunction, and therefore they are entitled to payment under the surety bond. This relates, in turn, to differing methodologies or timeframes to evaluate whether the issuance of an injunction is wrongful. Specifically, defendants contend that viewing the timing of Cooper's

alleged misconduct regarding contact with Onondaga Township's insurance agent and conversations with Johnson before litigation initiated in this matter demonstrates the impropriety of having issued the injunction and entitles defendants to payment on the surety bond.

Citing an earlier version of MCR 3.310(D)(1), and using dictionary definitions for the term "wrongful" because it is not defined in the court rule, this Court has concluded:

> The plain language of [the court rule] indicates as its object compensating a party for costs and damages sustained as a result of an injunction, which, based on the determination made on the merits of the underlying controversy between the parties, should not have been issued at all. [*Matter of Estate of Prichard*, 169 Mich App at 151.]

It is noteworthy that the incident of misconduct emphasized and primarily relied on by the trial court to determine violation by Cooper of the equitable clean hands doctrine was restricted to his actions during the later parts of the trial to improperly influence or intimidate a witness (Johnson) and her testimony. It is disingenuous to suggest, and impossible to find, that the misconduct alleged to have occurred in the later parts of the ensuing trial precluded the earlier issuance of the injunction, or its perceived need and propriety. In issuing the injunction, the trial court conducted a hearing and explained the factors considered in enjoining the dragway, including but not limited to proofs adduced regarding the harm being alleged and the possible impacts on all of the litigants and the community in general, which led the trial court to surmise a likelihood that Cooper would prevail on the merits of his nuisance claim. The trial court's final ruling, finding the existence of a private nuisance, belies any suggestion that the trial court's initial belief that Cooper would prevail on the legal issue was mistaken. Based on the point in time when the injunction was issued, and the information available to the trial court, issuance of the injunction cannot be construed as wrongful.

Defendants also suggest that the other alleged incidents of misconduct by Cooper, identified by the trial court, preceding his contacts with Johnson during the trial, supported the trial court's determination that Cooper had unclean hands and, therefore, resulted in the improper issuance of the injunction. This argument requires fairly massive leaps in logic and lacks merit.

To begin with, defendants rely on the federal court decision in *Blumenthal* to support their contentions and arguments.[6] In *Blumenthal*, the Second Circuit addressed what it means to be "wrongfully enjoined." The court explained:

> A party has been "wrongfully enjoined" under [the commensurate federal court rule] if it is ultimately found that the enjoined party had at all times the right to do the enjoined act. The conclusion that an injunction later dissolved was "wrongful," in the sense that the party had the right to do the enjoined act, does not necessarily imply that the district court abused its discretion in granting the

---

[6] Federal case law does not comprise binding precedent. *Sharp v City of Lansing*, 464 Mich 792, 803; 629 NW2d 873 (2001).

relief in the first place. "[A] temporary injunction may be wrongfully issued although the issuance may not have been improvident as an abusive exercise of the trial court's discretion."

The focus of the "wrongfulness" inquiry is whether, in hindsight in light of the ultimate decision on the merits after a full hearing, the injunction should not have issued in the first instance. This conclusion is supported by the plain meaning of [the applicable court rule] and the theory underlying it, that the applicant "consent[s] to liability up to the amount of the bond, as the price for [the injunction]. The injunction bond is designed "to cover any damages that might result if it were later determined that [the applicant] was not entitled to an injunction." Put another way, the question is whether the plaintiffs "ought not to have been enjoined." [*Blumenthal*, 910 F2d at 1054-1055 (citations omitted).]

The focus of *Blumenthal* is primarily, when viewed in hindsight, on the time when the injunction was issued. As noted by the trial court, the misconduct relied on to deny Cooper abatement of the nuisance occurred during trial involving the attempt to influence or intimidate Johnson's trial testimony and, therefore, could not have been a factor in the issuance of the injunction.

Defendants argue, however, that the other misconduct identified by the trial court involving Cooper, which precluded abatement of the nuisance, occurred before issuance of the injunction and that this misconduct should have also precluded the granting of the injunction. The misconduct referenced involved: (a) Cooper filing articles of incorporation for assumed names with the intention to interfere with the operation of the dragway, and (b) having contacted the Onondaga Township insurance carrier to inquire about its insurance policy. Defendants also allege that contacts between Cooper and Johnson, occurring in 2011, demonstrate a continuing pattern of misconduct that should have precluded issuance of the injunction.

Initially, when suggesting Cooper's 2011 contacts with Johnson comprised misconduct or intimidation, defendants misrepresent the record, Johnson's testimony, and the trial court's ruling. Johnson testified that her communications with Cooper, in 2011, were neither threatening nor intimidating, and that she viewed them as attempts to warn her on the basis of their friendship of possible concerns or implications involving her position with the Township and approval of the dragway. Further, these communications occurred two years before the Comers obtained the SUP for the dragway in 2013. Premised on Johnson's admission that the communications were not intimidating, coupled with their occurrence well before issuance of the SUP for the dragway, let alone the ensuing litigation, it is difficult to construe this as comprising misconduct that would preclude the propriety of the issuance of the injunction for what was ultimately found to be a demonstrable nuisance.

Similarly, reliance by defendants on the purported impropriety of issuing an injunction in light of Cooper's one-time telephone contact with Onondaga Township's insurance carrier to inquire about the Township's coverage in 2013, two years before the Comers obtained the SUP, is unavailing. In addition to the lack of any temporal contiguity between the telephone contact and issuance of the injunction, there is no logical relationship between the events. Even if, as alleged, Cooper misrepresented his authority to obtain the information he sought from the insurance agency, and which he did not receive, there is no demonstrable relationship between

the attempt to procure this information and the existence of a nuisance perpetrated by the Comers, Pranshka and the dragway. It should be emphasized that Onondaga Township elected to intervene in Cooper's lawsuit against the other defendants and that the injunction that issued had no effect on Onondaga Township; it simply precluded the ongoing operation of the dragway, which was owned and operated by the Comers and Pranshka. There is simply no discernable or logical relationship between the alleged misconduct and the reasons for issuance of the injunction.

Defendants also rely on Cooper's acknowledged filing of applications to secure various names for corporate entities in 2015, in an effort to interfere with the financial benefits and transaction of business by the dragway, justifying the trial court's finding of unclean hands and suggesting that the behavior should have precluded the issuance of the injunction. Significantly, this behavior occurred in 2015, but the bond covering the injunction was obtained a year earlier in August of 2014, in compliance with the concurrent issuance of the injunction. Again, it is difficult to construe how a later event (filing to establish corporate entities) could influence the earlier event (issuance of the injunction). Further, even if Cooper having engaged in these actions comprises misconduct, it does not obviate the factors that existed leading to the trial court's issuance of the injunction – a nuisance premised on sounds from the dragway, which were found to be excessively annoying and disruptive of Cooper's ability to use and enjoy his property.

Once again, defendants appear to confuse and attempt to conflate the factors involved in determining the propriety of issuing an injunction with those that are solely related to the availability of a remedy. The denial of a remedy does not equate to the absence, or obviate the existence, of an initial wrong having occurred and justifying the basis for the injunction. The trial court's denial of defendants' request to disburse the surety bond was not in error because the triggering mechanism of "wrongful enjoinment" was not effectuated.

## VII. CONCLUSION

We affirm in part and reverse in part the trial court's ruling and remand to the trial court for proceedings consistent with this opinion. We do not retain jurisdiction. In Docket No. 340303, no costs, no party having prevailed in full. In Docket No. 340304, defendants may tax costs. In Docket No. 342137, plaintiff may tax costs.

/s/ David H. Sawyer
/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly